682 So.2d 978 (1996)
Courtlande COLLINS, Sr., Plaintiff-Appellant,
v.
Wayne McELVEEN, Sheriff of Calcasieu Parish and Unknown Deputy Sheriffs of Calcasieu Parish, Defendant-Appellee.
No. 96-633.
Court of Appeal of Louisiana, Third Circuit.
November 6, 1996.
James Edwards Burks, Lake Charles, for Courtlande Collins, Sr.
Michael Steven Beverung, Lake Charles, for Wayne McElveen.
Before DOUCET, C.J., and SAUNDERS and AMY, JJ.
*979 AMY, Judge.
The appeal arises from the arrest of Courtlande Collins, Sr. on October 11, 1994, by a deputy of the Calcasieu Parish Sheriff's Office. Collins filed a suit against Wayne McElveen, Sheriff of Calcasieu Parish, seeking damages for the alleged failure of the Calcasieu Parish Sheriff's Office to return a sum of money he claims to have been taken from him when he was arrested. The trial court found that Collins failed to prove his claim by a preponderance of the evidence. For the reasons which follow, we affirm.

DISCUSSION OF THE RECORD
On October 11, 1994, at approximately 10:00 p.m., plaintiff, Courtlande Collins, Sr., was stopped by Calcasieu Parish Sheriff's Deputy Lee Schreve on Broad Street in Lake Charles, Louisiana. Deputy Schreve stopped Collins because he was following too close to the vehicle in front of him. After Deputy Schreve had ascertained that Collins' license had been suspended, he arrested Collins. Deputy Schreve handcuffed Collins, who was wearing a prosthesis on his left leg, and placed Collins in the back seat of the police vehicle. At that point, Deputy Schreve began to transport Collins to the Calcasieu Parish Correctional Center. However, during the ride, when Deputy Schreve crossed the railroad tracks near Chennault Field, Collins complained that he had been injured because he was "bounced" around in the back of the vehicle.
When Deputy Schreve arrived at the correction center, he called an ambulance and a local ambulance service transported Collins to Moss Regional Hospital. When Collins refused treatment, Deputy Schreve transported him back to the correctional center. Collins was booked in and placed in a holding cell overnight. The next morning, while Collins was being processed for release, the Calcasieu Parish Sheriff's Office discovered that the Grant Parish Sheriff's Office had issued a "hold" for a Courtlande Collins because of a traffic violation. Collins was then informed that he could not be released until he paid that ticket, which was in the amount of $195.50. Collins arranged for that ticket to be paid. However, it was subsequently discovered that the violation in Grant Parish was for his son, Courtlande Collins, Jr.
Before his release, Collins was presented with an inventory form to sign which allegedly listed all the property that he had on his person when he was booked the previous night. Collins refused to sign that form when he read that he only had $197.00 in his wallet at the time of his booking. Collins informed an employee of the Calcasieu Parish Sheriff's Office that he had $3,200.00 in his wallet when he was arrested. After Collins was released, he filed a complaint with the Calcasieu Parish Sheriff's Office; however, Collins did not receive a favorable response.
On December 20, 1994, Collins filed a "Petition For Return of U.S. Currency" against Wayne McElveen, the Sheriff of Calcasieu Parish, and his employees who were working at the Calcasieu Parish Sheriff's administrative building when he was arrested. A trial on the merits was held on January 4 and 5, 1996. The trial court rendered judgment on January 29, 1996, against Collins on his claim for the return of the alleged $3,200.00. Specifically, the trial court found that Collins had failed to prove by a preponderance of the evidence that he had $3,200.00 in his wallet on October 11, 1994, when he was arrested. However, the trial court granted judgment in favor of Collins for $195.50, the amount which Collins paid for the traffic violation in Grant Parish of his son.
Collins appeals from that judgment and asserts that the trial court was clearly wrong in finding that he did not prove by a preponderance of the evidence that he had $3,200.00 in his wallet when he was arrested.

LAW
In a civil suit, the plaintiff bears the burden of proving every element of his case. Derouen v. State Farm Mut. Auto. Ins. Co., 445 So.2d 139 (La.App. 3 Cir.1984). One who asserts a fact in a civil action must carry the burden of proving that fact by a preponderance of the evidence. Artificial Lift, Inc. v. Production Specialties, Inc., 626 So.2d 859 (La.App. 3 Cir.1993), writ denied, 94-112 (La.3/11/94), 634 So.2d 394; Dupre v. *980 Joe's Riverside Seafood, Inc., 578 So.2d 158 (La.App. 1 Cir.1991). Proof by a preponderance of the evidence exists when the evidence, taken as a whole, shows that a fact sought to be proved is more probable than not. East v. Crying Eagle Constr., 95-560 (La.App. 3 Cir. 11/22/95), 664 So.2d 746, writ denied, 95-3077 (La.2/16/96), 667 So.2d 1057; Glenn v. State Farm Mut. Auto. Ins. Co., 617 So.2d 176 (La.App. 3 Cir.1993). "If the party bearing the burden of proof fails to satisfy his burden by the requisite preponderance, his case fails to outweigh his adversary and he necessarily loses." Smith v. State Dept. Of Health & Hosp., 94-871, p. 11 (La.App. 3 Cir. 2/15/95), 650 So.2d 450, 456, writ denied, 95-693 (La.4/28/95), 653 So.2d 596. An appellate court will not set aside a trial court's finding of fact unless it is clearly wrong or manifestly erroneous. Lewis v. State Through Dept. Of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311; Weatherford v. Commercial Union Ins., 94-1793 (La.2/20/95), 650 So.2d 763.
The trial court, in its oral reasons for judgment, stated in pertinent part that:
This case, succinctly put, involves principally the claim by the plaintiff for the return of $3200 in cash which he says that he had on him when he was arrested and which he did notwas not returned to him when he was released. And there's a whole lot of other ancillary circumstances and facts brought up in the testimony, and maybe this is the place for me to state again what the Court understood was at issue in this case; and, that is, what's at issue in this case is the claim for the return of the $3200 and as announced in argument a claim for the money paid on the ticket which that's all within the pleadings and for any damages relating to the failure to return the money or the failuredamages related to being required to pay the ticket. I have not considered this case for anything more than that and I'm not considering it or going to bother analyzing anything about any claim how Mr. Collins claims he was treated, effecting it. I suppose everybody went into all that, just trying to bear on the credibility one way or the other, the general conduct. I don't know any other relevance a lot of that had to do with the case here; so, I'm restricting my ruling here to the elements I just announced.
We also focus our review strictly on whether the trial court erred by finding that Collins did not prove by a preponderance of the evidence that he had $3,200.00 in his wallet at the time he was booked at the Calcasieu Parish Correctional Center.
The following evidence was enunciated at trial on this specific issue.
Collins testified that, on October 11, 1994, he had $3,200.00 all in $100.00 bills in his wallet. He stated that he had won over $2,000.00 at the Players Casino Riverboat playing blackjack a few days earlier. Also, he testified that he had received a $2,500.00 refund from an insurance company for a homeowner's insurance policy. Collins noted that he received the refund because the insurance company denied his application for insurance. However, he could not remember the name of the insurance company nor did he have a receipt from Calcasieu Marine Bank where he allegedly cashed the insurance company's refund check. He stated that he gave his wife, from whom he was separated, $500.00 to "help her with things she needed to do around the house." He further stated that he paid some of his bills. Finally, he acknowledged that he carried around $3,200.00 in his wallet for about three days before he was arrested.
Collins testified that, prior to getting arrested, he went to visit a friend, Gloria Sanders. Also, he stated that after his visit with Sanders, he went to see John Eric Zenon to inquire about purchasing a used BMW automobile from him. Collins testified that he offered Zenon $2,500.00 to hold the vehicle for him. But, Collins noted, Zenon refused to accept the money.
Collins testified that he was arrested on October 11, 1994 for driving with a suspended license and that he was transported to Calcasieu Parish Correctional Center by Deputy Schreve. Collins stated that he was placed in a holding cell at the facility. Collins then testified that he gave all of his personal property, except for his wallet, to Deputy Leslie Blanchard. When Collins was *981 asked what happened next, the following colloquy took place:
Q. What's the next thing that happened?
A. A while passed and one of themI don't recall his namepassed and I asked him, could Iwas there a chance that I could use the phone so I could call to make arrangements to be let out; and I said, I would like to bond myself out. He said, how can you bond yourself out because, you know, we've got all your stuff. We didn't see any money. I said, well, my money is in my pocket. He left and a moment later the four deputies came back again with an intimidating move and demanded that I give them my money.
Collins testified that he handed his wallet to Deputy Blanchard. Collins noted that Deputy Blanchard did not count the money and that he and the other deputies then left and went into the middle of the building.
Collins testified that he spent the night in the holding cell at the Calcasieu Parish Correctional Center. He stated that, the next morning, Deputy Donald Christopher Holmes allowed him to use the telephone. He further stated that Deputy Holmes presented him with an inmate property record for him to sign. Collins said that he read the document, but that he refused to sign it because "the contents didn't match up." Collins stated that he informed Deputy Holmes that he had $3,200.00 in his wallet when he was brought in to the facility the previous night. However, Collins continued, the inmate property record [1] only stated that he had $197.00 in his wallet. Collins stated that he refused to sign the top part of that document, which was introduced into evidence.
Collins testified that he was informed by an employee of the Calcasieu Parish Sheriff's Office that he could not be released from custody until he had paid a traffic ticket from Grant Parish, which amounted to $195.50. At that point, Collins stated he called his friend Gloria Sanders for assistance. Collins also stated that he eventually found out that the ticket in Grant Parish was in the name of his son, Courtlande Collins, Jr., who attended Grambling University there. Collins testified that Deputy Holmes then "came back and went through the process of fingerprinting me and taking my picture."
Collins stated that Sanders soon arrived at the Calcasieu Parish Correctional Center with the $195.50 needed to pay the ticket. Prior to bonding out, Collins testified that Deputy Richard Gray approached him to sign "the release of my items." The release section was on the same document as the inmate property record that Collins had refused to sign earlier. Collins admitted that he signed the release part, but made the following notation: "I Courtlande Collins Received All Properties except my mony [sic] I had 3200.00 Dollars When Booked." Collins also initialed the notation. Collins testified he was then allowed to leave the correctional facility. Finally, Collins testified that, immediately after his release, he filed a complaint with the Calcasieu Parish Sheriff's Office regarding the $3,200.00.
Gloria Sanders testified that she had been a friend of Collins for approximately four years. Sanders testified that Collins came to visit her at her house on October 11, 1994, at about 12:00 p.m. She stated that Collins had brought her some chili. Sanders further stated that Collins informed her that he had "gotten very lucky" and had won "a sizable amount of money" on the Riverboat in Lake Charles. She noted that Collins then opened his wallet and "sort of fanned out bills." Sanders said that she saw $100.00 bills in Collins' wallet. However, she admitted that Collins did not count the money. She testified that Collins visited with her for about two hours and then left.
Sanders testified that Collins phoned her the next morning from the Calcasieu Parish Correctional Center and asked for her assistance to find out about a ticket that he had allegedly received in Grant Parish. She then stated that she contacted the Grant Parish Sheriff's Office and learned that the ticket was for Collins' son. Further, Sanders testified *982 that she went to the Calcasieu Parish Correctional Center and paid the ticket from Grant Parish. She also noted that Collins reimbursed her.
John Eric Zenon testified that Collins had approached him with some money to purchase a used BMW automobile. Zenon opined that Collins offered him about $2,500.00 in cash, but that he refused to accept the cash because the price of the BMW was $5,500.00. But, Zenon could not remember the specific date of his encounter with Collins.
Lee Schreve testified that he was employed with the Calcasieu Parish Sheriff's Office as a reserve deputy. Deputy Schreve further testified that he arrested Collins on October 11, 1994, at approximately 10:00 p.m., for driving with a suspended license. Deputy Schreve stated that he handcuffed Collins and placed him in the rear seat of the police vehicle. Deputy Schreve testified that he then began to drive to the Calcasieu Parish Correctional Center. He stated that when he crossed the railroad tracks near Chennault Field, he heard Collins scream that he was hurt. Deputy Schreve said that when he arrived at the correctional facility, he phoned an ambulance and that Collins was then transported to Moss Regional Hospital. However, Deputy Schreve stated that when Collins refused treatment, he handcuffed Collins again and transported him back to the correctional facility.
Deputy Schreve testified that when he arrived back at the correctional facility, Collins was removed from the rear seat of his vehicle with the assistance of at least two deputies. Deputy Schreve then stated that he completed a "book-in sheet" and placed Collins in the custody of the correctional facility. He testified that Collins was "upset and struggled with the deputies."[2] Deputy Schreve stated that he did not remove any personal belongings from Collins.
Leslie Blanchard testified that he was a deputy with the Calcasieu Parish Sheriff's Office. Deputy Blanchard stated that he was the "intake supervisor" for the "B shift nights." Deputy Blanchard testified that Collins was brought to the correctional facility by Deputy Schreve at about midnight on October 12, 1994. Deputy Blanchard testified that he, Michael Taylor, and Glen Richard assisted in taking Collins out of the rear seat of Deputy Schreve's vehicle. Deputy Blanchard stated that they brought Collins into the correctional facility and placed him in Holding Cell # 1.
Deputy Blanchard testified that he performed a "general pat down" on Collins to check for weapons. At that point, Deputy Blanchard stated that he removed Collins' wallet and then proceeded to count the money in the wallet in the doorway of Holding Cell # 1. He further stated that after he counted the money, he told Collins that he had $197.00 in his wallet. Deputy Blanchard then testified that he put the wallet and the cash on top of the cubicle in front of Holding Cell # 1 and walked back into the cell and removed the rest of the property on Collins. He testified that Deputies Jeffery Sigmund and Glen Richard counted the money immediately after he did. Deputy Blanchard admitted that he did not present Collins with an inventory record document at that particular time because Collins "had refused to cooperate." Deputy Blanchard noted that he left that task for the day shift to complete. Finally, Deputy Blanchard testified that he did not keep any of Collins' personal belongings.
Jeffery Sigmund testified that he was employed as a deputy by the Calcasieu Parish Sheriff's Office. Deputy Sigmund further testified that he was the assistant shift supervisor for the "B shift nights." Deputy Sigmund stated that he assisted Deputy Blanchard with Collins on October 12, 1994. Deputy Sigmund testified that Deputy Blanchard handed him Collins' personal property, including his wallet. Deputy Sigmund noted that, at that point, he counted the money and it amounted to $197.00. Deputy Sigmund stated that he then gave the money to Deputy Glen Richard to verify his count. Deputy Sigmund testified that he did not take any money from Collins while he was incarcerated.
*983 Glen Richard testified that he was working for the Calcasieu Parish Sheriff's Office as an "intake officer" on the night Collins was arrested. Deputy Richard noted that he assisted in the book-in process when Collins was brought to the correctional facility. Deputy Richard described Collins as "belligerent" and "upset" when he was being booked in. Further, Deputy Richard stated that Collins was not being cooperative with the deputies at the correctional facility. Deputy Richard testified that he assisted in carrying Collins from Deputy Schreve's vehicle into the correctional facility. Deputy Richard also stated that he was approximately ten feet behind Deputy Blanchard when Deputy Blanchard retrieved Collins' wallet. Deputy Richard said that Deputy Blanchard stood in the doorway of Holding Cell # 1 and proceeded to count the money in Collins' wallet. Deputy Richard then said that Deputy Blanchard told Collins how much money he had counted and then placed the money and wallet on a podium. At that point, Deputy Richard continued, Deputy Blanchard when back into Holding Cell # 1 to retrieve other personal belongings from Collins.
Deputy Richard testified that Deputy Sigmund then counted the money. Deputy Richard stated that, when Deputy Sigmund finished counting the money, he counted the money and wrote a receipt for $197.00. Deputy Richard testified that he then followed routine procedure by placing Collins' property in a yellow envelope, stapled it shut with the receipt on the outside of the envelope, and placed the envelope in the safe. Finally, Deputy Richard testified that he did not take any money from Collins.
Damon Daugereau testified that he was employed as a deputy by the Calcasieu Parish Sheriff's Office. Deputy Daugereau stated that he was a night shift supervisor at the correctional facility. Deputy Daugereau testified that he was present when Collins was brought in by Deputy Schreve. Deputy Daugereau stated that Collins "was uncooperative and they [deputies] were unable to get information out of him." When Deputy Daugereau was asked why Collins was not presented with the inmate property inventory form after the deputies had retrieved the property from his person, Deputy Daugereau replied:
If the subjectdepending on the situation, if he's intoxicated or just refusing at the time because he may be mad because he got arrested and not want to cooperate with us, we'll leave thelike, for instance, the phone call blank, property blank and let the next shift or hours later after the person calms down and willing to cooperate, give him the opportunity to sign it again.
Donald Christopher Holmes testified that he was employed as a deputy for the Calcasieu Parish Sheriff's Office. Deputy Holmes stated that he worked the day shifts in the intake division at the correctional facility. Deputy Holmes testified that on October 12, 1994, at about 7:00 a.m., he approached Collins and began to complete the booking procedure, such as fingerprinting and taking a photograph of Collins. Deputy Holmes also testified that he presented Collins with the inmate property record document for Collins to sign. However, Deputy Holmes stated that Collins refused to sign that document because the document specified that Collins had $197.00 when he was brought in the previous night. Deputy Holmes indicated that Collins informed him that he had $3,200.00 in his wallet when he was brought into the correctional facility. Deputy Holmes testified that he then noted on the document that Collins had refused to sign and initialed it.
After hearing the evidence, the trial court stated in part:
The issue is whether it's been established by a preponderance of the evidence that he [Collins] had $3200 when he went in that jail. And I'm satisfied that on the record of this case and under our jurisprudence that what evidence has been adduced on that issue is not of such weight and sufficiency when weighed against the equally credible denials by the other parties [deputies] or even standing along enough to establish the fact, the first necessary fact, that he had that cash when he went in jail.
The trial court was faced with two permissible views of the evidence: (1) Collins had $3,200.00 in his wallet when he was brought *984 into the correctional facility or (2) Collins did not have $3,200.00 in his wallet. The trial court specifically found that Collins had failed to meet his burden of proof and chose to believe the latter view of the evidence. The appellate standard of review was thoroughly discussed in Stobart v. State, Through DOTD, 617 So.2d 880, 882-883 (La.1993), where the Louisiana Supreme Court explained:
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder's determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel that its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness's story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844-45. Nonetheless, this Court has emphasized that "the reviewing court must always keep in mind that `if the trial court or jury's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.'" Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
This court has recognized that "[t]he reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id.

After a review of the record and the precepts of the appellate standard of review explained in Stobart, we cannot conclude that the trial court was manifestly erroneous in finding that Collins failed to prove by a preponderance of the evidence that he had $3,200.00 in $100.00 bills when he was brought into the Calcasieu Parish Correctional Center on October 11, 1994.

DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed against plaintiff-appellant, Courtlande Collins, Sr.
AFFIRMED.
NOTES
[1] The inmate property record also revealed that Collins had the following property on him when he was booked: a watch, lighter, file knife, bill-fold, four keys, a ring, four condoms, chapstick, four antihistamine tablets, a gold chain, brown shoes, black pants, and a black shirt.
[2] Collins, on the other hand, testified that he cooperated with the deputies.