# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-0748

LA PAC MANUFACTURING, INC., ET AL.

VERSUS

TCM MANUFACTURING, INC., ET AL.

************

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF ACADIA, NO. 81663
HONORABLE DURWOOD CONQUE, DISTRICT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Michael G. Sullivan, Judges.

**AFFIRMED.**

Alan K. Breaud
Timothy W. Basden
Breaud & Meyers, A P.L.C.
Post Office Drawer 3448
Lafayette, LA 70502
(337) 266-2200
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    La Pac Manufacturing, Inc.
    Louisiana Bag Company
    Peter Michael John
    David Mitchell John

Edwin G. Preis, Jr.
James A. Lochridge, Jr.
Danielle M. Smith
Benjamin J. Durrett
Preis & Roy

**Post Office Drawer 94-C**
**Lafayette, LA 70509**
**(337) 237-6062**
**COUNSEL FOR DEFENDANT/APPELLEE:**
       **CLECO Corporation**

PETERS, J.

The plaintiffs in this litigation, La Pac Manufacturing, Inc. (La Pac), Louisiana Bag Company (La Bag), Peter Michael John, and David Mitchell John, brought this action against a number of defendants to recover damages they sustained when a manufacturing plant and warehouse they owned and/or occupied sustained extensive fire damage. They appeal the trial court grant of a summary judgment in favor of one of the defendants, CLECO Corporation (CLECO), dismissing it from the litigation. For the following reasons, we affirm the trial court grant of the summary judgment.

## DISCUSSION OF THE RECORD

The property at issue in this litigation was a 133,000-square-foot facility located in Crowley, Louisiana, and owned by Peter Michael John and David Mitchell John. It served as the offices, plant facilities and warehouse space for both La Pac and La Bag. La Pac is a textile manufacturer, and La Bag is a wholesale distributor of packaging products. The facility housed the supplies and equipment used in the manufacturing process, including over 50 looms; polypropylene; cloth; burlap; cardboard boxes; and tanks of fuel, propane, alcohol, and ink.

On Easter Sunday night in 2003, a fire completely destroyed the facility. The plaintiffs assert in their pleadings that an electrical short in a forklift ignited a propane tank and that the fire quickly spread throughout the facility, resulting in the total loss of the building and its contents. The plaintiffs instituted suit against the manufacturer and the distributor of the forklift, as well as against CLECO. The asserted liability of the manufacturer and the distributor was negligence, strict liability, and products liability.[1]

_____

[1] Any issues relating to the liability of these parties are not before the court in this appeal.

As to CLECO's liability, the plaintiffs asserted that this electrical provider did not timely disconnect the power to the plant after having been requested to do so by the Crowley Fire Department. The assertion of liability against CLECO relates to the fact that the plant housed eighteen[2] large exhaust fans mounted on the west and south exterior walls, which routinely ran day and night. These fans apparently continued to run until CLECO employees externally disconnected the electrical power feeding the plant. The plaintiffs argue that the continued operation of these exhaust fans fed the fire, resulting in more extensive damage than would have otherwise occurred had CLECO timely disconnected the power. CLECO responded to the plaintiffs' pleadings by filing, among other pleadings, a motion for partial summary judgment. The hearing on the motion established that most of the facts surrounding the incident are not seriously disputed.

The record establishes that, because of the Easter holiday weekend, a skeleton crew of eleven or twelve individuals were working at the time of the fire.[3] Sometime that evening, one of the employees noticed smoke in the building, and, a few minutes after 9:00 p.m., a small localized fire was discovered near the loading docks. At 9:22 p.m., and after an unsuccessful attempt by one of the employees to extinguish the fire with a fire extinguisher, the Crowley Fire Department received a call for assistance.

Chief Russell Meche of the Crowley Fire Department initially instructed his dispatcher to call SLEMCO, another electric utility company with lines in the area. According to Chief Meche, when there is a fire, it is standard policy to call the utility companies to have them disconnect the electrical power at the fire scene. When Chief

---

[2]Two of the fans were forty-eight inches in diameter, and sixteen were thirty-six inches in diameter.

[3]Normally, sixty to seventy individuals would have been working the night shift.

2

Meche called his dispatcher again, he was told that SLEMCO had determined that it did not provide electrical service to the building. Chief Meche then told the dispatcher to call CLECO and advise whomever he spoke with that he needed the appropriate crew to hurry to the scene.

The dispatcher's telephone call came to CLECO's Distribution Operation Center (Center) in Pineville, Louisiana, at 9:31 p.m. Glenn Johnson, CLECO's "on call" line mechanic responsible for the Crowley area, received a telephone call from the Center almost immediately thereafter and left his Eunice, Louisiana home to drive the twenty-five or thirty minutes to Crowley within minutes of receipt of the call. In route, he called Wallace Hebert, another CLECO line mechanic, who was not on duty, but who lived in Crowley. He informed Hebert of the fire and instructed him to take a bucket truck and disconnect the transformers on the north side of the plant.[4] When Johnson got to the transformers on the southeast side, he stopped and disengaged the current from that service source with a long pole designed for that purpose.

At about the same time that Johnson was disconnecting the service on the southeast side, Hebert was doing the same thing on the north side with the bucket truck. Hebert, whose residence is approximately one mile from the plant, had already gone to bed when he received a call from Johnson. He dressed and drove to the local CLECO facility[5] and acquired the bucket truck. While at the CLECO facility, he received a telephone call from Johnson, who told him that he was already in Crowley at the southeast service source. Hebert then took the bucket truck through the traffic to the north side of the plant and disconnected the transformers at that location. After

_____

[4]According to Johnson, the plant was serviced by two locations, one on the north side of the plant and the other on the southeast side. Disconnecting the north side transformers required a bucket truck, while the southeast transformers could be disconnected without use of a bucket truck.

[5]The CLECO facility is located two blocks from the fire location.

he disconnected the transformers, he saw that a pole from a SLEMCO line was smoking, and, afraid it might fall, he disconnected the power along the section serviced by that pole. Next, the Louisiana State Police requested that he disconnect the service for a distance around the burning plant. He complied with that request by opening the breakers at two substations in the area. By the time he had completed this task, it was around 11:30 p.m.[6]

The summary judgment evidence also included a report of the Bureau of Alcohol, Tobacco, and Firearms, which indicated that, by the time the first Crowley firemen arrived, the fire was too intense to consider an inside assault on the fire. Nevertheless, plant officials were able to go inside the plant and turn off the extruding machines and to move company trucks away from the building. In fact, as late as 10:00 p.m., plant employees entered into the offices and saved the computers and files. It was sometime thereafter that the electrical power to the building was terminated by Johnson and Hebert.[7]

The affidavit of Roger Tate, an expert mechanical and fire protection engineer, established that, in one minute, each fan in the plant could extract a volume of air equivalent to that found in a seventy-foot by 100-foot building with a twenty-foot ceiling. He further asserted in his affidavit that, "[s]ince all of the exhaust fans were located in the West half of the building, the operation of the exhaust fans dramatically affected the growth of the fire and caused the fire to spread rapidly into the western portion of the building from the warehouse area [the eastern portion of the building] where the fire originated."

---

[6]Hebert's time records reflect that he worked from 10:00 p.m. on the evening of the fire until 5:00 a.m. the next morning.

[7]The record does not establish the exact time the electricity was disconnected at either the north or the southeast locations.

4

The affidavit of Frederick M. Brooks, an electrical engineer and fire and explosive investigator, contradicted Tate's affidavit in that he suggested that the continued operation of the ventilation fans might have proven beneficial during the course of the fire by drawing away products of combustion from the fire source, thereby allowing more time for personnel evacuation, more visibility for fire responders, and a reduction of the hazard of smoke inhalation. He opined that CLECO's response was appropriate and consistent with industry practice.

At the hearing on the motion for summary judgment, the trial court concluded that there were no issues of material fact and that CLECO had a legal duty to disconnect the electricity if and when it became aware that the electricity was presenting a danger to the building. Therefore, under the facts of this case, the trial court concluded that CLECO's response was appropriate. Thus, the trial court granted CLECO's motion for summary judgment. Thereafter, the plaintiffs perfected this appeal.

On appeal, the plaintiffs assert that the trial court erred in granting the summary judgment. Specifically, the plaintiffs argue that CLECO's duty to respond in a reasonable manner to the request to disengage electrical power at the plant "extend[ed] to all risks posed by electrical current, including the fire-enhancing effects of the ventilation system at the facility."

**OPINION**

Appellate courts review summary judgments *de novo*, using the same criteria that govern the trial court's consideration of whether summary judgment is appropriate. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991). A court must grant a motion for summary judgment "if the pleadings,

5

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(B). The summary judgment procedure is favored under our law. La.Code Civ.P. art. 966(A)(2). Additionally, La.Code Civ.P. art. 966(C)(2) provides:

> The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact.

In this case, CLECO does not have the burden of proof at trial.

In reviewing the trial court's judgment, we first note that this is a negligence case and that a duty-risk analysis is the appropriate review approach. *See Lajaunie v. Cent. La. Elec. Co.*, 552 So.2d 746 (La.App. 1 Cir. 1989), *writ denied*, 558 So.2d 1130 (La.1990).

> The duty-risk analysis is the standard negligence analysis employed in determining whether to impose liability under LSA-C.C. art. 2315. This approach provides an analytical framework for evaluation of liability. One analysis requires proof by the plaintiff of five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element). A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability.

*Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095, p. 7 (La. 3/10/06), 923 So.2d 627, 632-33 (citations omitted).

6

In *Lemann*, the supreme court explained the duty element as follows:

> A threshold issue in any negligence action is whether the defendant owed the plaintiff a duty. Whether a duty is owed is a question of law. In deciding whether to impose a duty in a particular case, the court must make a policy decision in light of the unique facts and circumstances presented. The inquiry is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty.

*Id.* at 633 (citations omitted).

The jurisprudence has established two levels of duty owed by power companies in the distribution of their product. *Pillow v. Entergy Corp.*, 36,384 (La.App. 2 Cir. 9/18/02), 828 So.2d 83, *writ denied*, 02-2575 (La. 12/13/02), 831 So.2d 987. When the risk involves electrocution, the duty is that of utmost care. *Id.* In other cases which involve accidents that occur on the property of the customer and are allegedly caused by some action or inaction on the part of the electric utility company, the utility company's duty is that of reasonable care in the installation, operation and maintenance of its electric lines. *Id.* An electric company is not the insurer of the property of its customers and is not legally obligated to safeguard against occurrences that it cannot reasonably expect or contemplate. *Id.*

In *Hughes v. Louisiana Power & Light Co.*, 94 So.2d 532, 537 (La.App. 1 Cir. 1956), the first circuit stated that, in the absence of the power company's actual or constructive knowledge of defects in a private wiring system or appliances, the power company's duty terminates at its meter. That is to say, a power-generating company is not liable for damages arising from its failure to shut off electrical current passing to a customer's defective wires or equipment when it did not know, or reasonably should not have known, of any defect. When the power-generating company knows, or should know, of such a defect and continues to supply power, its liability is based not on the defective condition

7

itself, but more particularly on its energizing of the line with knowledge of the conditions. *Id*.; *see also Giordano v. Rheem Mfg. Co.,* 93-1614 (La.App. 3 Cir. 10/5/94), 643 So.2d 492.

The plaintiffs' basic argument is that CLECO had a duty to disengage the electricity of the plant when requested to do so by the Crowley Fire Department and that it failed to do so in a reasonable manner. They then expand this duty to state that it extends to all risks presented by electricity in the building and that the fan-enhanced fire damage was caused by CLECO's delay in disconnecting the electricity. Specifically, they suggest that placing its ability to respond in the hands of an on-call line mechanic twenty to thirty minutes away from the scene did not constitute a reasonable response and that an immediate response was obligatory because the fans continued to run and augmented the flames. Thus, they argue that the reasonableness of CLECO's response is a factual issue which remains unresolved, making summary judgment inappropriate in this case. However, as suggested by the supreme court in *Lemann*, the threshold issue is whether, in light of the unique facts and circumstances presented, CLECO owed the plaintiffs a duty to cut off the fans. It is at this level of the duty-risk inquiry that the plaintiffs' case against CLECO meets its demise.

Although the plaintiffs' arguments have a certain logic in that disengaging the electricity sooner would have had the effect of stopping the fans sooner, the inquiry is not that simple. If a utility company, after receiving a request to disconnect its service to property served by its lines because of an ongoing fire, should be charged with a duty to prevent property damage caused by electricity-promoted augmentation of the fire, it could comply with its duty expeditiously in only one way—it would have to kill power to that service by the quickest means possible even if it meant a network disconnect involving thousands of users far removed from the fire itself. The social and economic implications

8

of such a dire reaction are easily foreseeable, for it could well cause more damage than it sought to prevent. Additionally, the plaintiffs have directed us to no statute, regulation, or jurisprudence that places a duty on a utility company to disconnect electricity in a burning building in order to disconnect ventilation fans to prevent the movement of air and the consequent augmentation of the fire. Such a duty in the circumstances of this case would be unreasonable.

In this case, the evidence fails to establish that CLECO knew or should have known of the existence of the fans, much less the fact that the location was such that the fans might spread it. There is no evidence that, when the dispatcher for the Crowley Fire Department contacted CLECO, he made any mention of the existence of the ventilating fans or that anyone had attempted to cut them off prior to that time. In fact, the electrical service entrance where the ventilator fans could have been turned off manually was located on the west wall near the office area where the employees had entered as late as 10:00 p.m. to retrieve the computers and company records. Despite being in close proximity to the manual cutoff switches, the employees made no effort to stop the fan operations.

Given the undisputed facts, there were no defects in CLECO's own equipment or lines, and, therefore, CLECO had no duty to prevent or retard a fire beyond its meter where it neither knew nor reasonably should have know of any electrical defect existing on the plaintiffs' side of the meter. We agree with the trial court's conclusion that, under the circumstances of this case, CLECO had no duty to disconnect the electricity solely to offset the risk of the fire's augmentation caused by the continued operation of the ventilation fans.[8]

---

[8]The plaintiffs have argued that, if we find CLECO did not have a duty to turn off the electricity to turn off the fans, we should find that it assumed such a duty when it instructed the Crowley Fire Department not to turn off the electricity during a fire but to await CLECO's arrival. Factually, that is not what the summary judgment evidence showed. Fire Chief Meche testified that CLECO requested they not "pull the glass," which we understand means turning off the electricity

9

## DISPOSITION

For the reasons set forth herein, we affirm the trial court's grant of the summary judgment dismissing CLECO Corporation as a party defendant in this litigation. We assess all costs of this appeal to the plaintiffs, La Pac Manufacturing, Inc., Louisiana Bag Company, Peter Michael John, and David Mitchell John.

**AFFIRMED.**

---

at the meter, because that could be hazardous to the firemen pulling the glass. The firemen, however, were free to disconnect service by levers or circuit breakers, as were the owners of the property. We do not find it necessary to address the assumption of duty argument beyond saying that, if this defendant did not have a duty to the owners of the property in this case to turn off the electricity to turn off the fans, it did not assume such a duty when it merely requested that firemen for their personal safety not disengage the meter.