NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

09-346

J. QUENTIN SIMON

VERSUS

MACRO, INC.

************

APPEAL FROM THE
CITY COURT OF LAFAYETTE
PARISH OF LAFAYETTE, NO. 2008CV00938
HONORABLE DOUGLAS J. SALOOM, CITY COURT JUDGE

************

JIMMIE C. PETERS
JUDGE

************

Court composed of John D. Saunders, Jimmie C. Peters, and James T. Genovese, Judges.

AFFIRMED.

J. Quentin Simon
Post Office Box 52851
Lafayette, LA 70503
(337) 235-3200
COUNSEL FOR PLAINTIFF/APPELLEE:
    J. Quentin Simon

Kevin M. Dills
Davidson, Meaux, Sonnier & McElligott
Post Office Drawer 2908
Lafayette, LA 70502-2908
(337) 237-1660
COUNSEL FOR DEFENDANT/APPELLANT:
    Macro, Inc.

PETERS, J.

The plaintiff, J. Quentin Simon, brought suit in proper person[1] against Macro, Inc. (Macro), alleging that Macro was liable for damages to the engine of his mudboat caused by the use of diesel fuel instead of gasoline. Macro has appealed the trial court judgment of $2,557.98 rendered in Mr. Simon's favor. For the following reasons, we affirm the trial court judgment in full and admonish both J. Quentin Simon and Kevin M. Dills, counsel for Macro, for the inappropriate language in their briefs on appeal.

## DISCUSSION OF THE RECORD

It is undisputed that on July 29, 2007, a Macro employee loaded diesel fuel into an unleaded gasoline underground holding tank at a Tobacco Stop Convenience Store in Lafayette, Louisiana, and that on that same day, Mr. Simon purchased what he thought was unleaded gasoline from that fuel station. Mr. Simon asserts that when he used this fuel in his mudboat, the mudboat's engine was damaged; the extent of damage and the cost of repair were the primary issues in this litigation.

At trial, the trial court heard testimony from four plaintiff witnesses and three defense witnesses. Mr. Simon testified that he purchased 27.42 gallons of fuel for his truck and mudboat.[2] Approximately eight to ten gallons of the fuel was pumped into the tanks of the mudboat, with the remainder being pumped into the truck. According to Mr. Simon, he had purchased the mudboat in October of 2005 for $5,700.00, and prior to July 29, 2007, it had performed well.

Mr. Simon, accompanied by Chuck Huebner and Michael Klenke, then drove to West Cote Blanche, put the mudboat into the water at that landing, and drove the

---

[1]The plaintiff is a practicing attorney.

[2]The mudboat is described as an eighteen-foot aluminum hull boat with a 350 cubic inch V-8 engine designed to run on gasoline, not diesel.

mudboat for twelve to fifteen minutes to Mr. Simon's hunting camp without any apparent difficulty. However, on the return trip, the mudboat's engine smoked and was unresponsive. Additionally, when they reached the boat dock, Mr. Simon's truck would not start and had to be towed to Hub City Ford in Lafayette, Louisiana. Hub City Ford repaired Mr. Simon's truck and returned it to him with a $576.00 bill.

According to Mr. Simon, he next used his mudboat on the weekend of August 4, 2007. The engine again smoked and the throttle was unresponsive. Additionally, he heard a distinct ticking noise in the engine. Four days later, he first learned that the problems with his truck were caused by diesel in the fuel tank. The next day, on August 9, 2007, he presented the Hub City Ford statement to Macro. Macro paid the bill in full.

In early September of 2007, Mr. Simon took his mudboat to Robert's Auto Repair in Lafayette, Louisiana. After draining and flushing the fuel tank, replacing the fuel filter, and working on the spark plugs, Robert Courville, the shop owner, returned the mudboat to Mr. Simon with an invoice for $161.01. The invoice, dated September 14, 2007, contains the notation that "ENGINE RUNS OKAY." However, Mr. Courville, a thirty-year mechanic accepted by the trial court as an expert in automobile engine repair, testified that the notation only referred to a check of the engine while on its trailer. According to Mr. Courville, a final compression check revealed that the compression was low, but he could not run the mudboat under a full load out of the water, and he advised Mr. Simon to test the mudboat on the water.

Mr. Simon followed Mr. Courville's instructions and, accompanied by Jean Paul LaMaison, took the mudboat for a test run. According to both Mr. Simon and Mr. LaMaison, the same problems—smoking engine, unresponsive throttle, and

2

ticking noises—remained present. Mr. Simon contacted Robert's Auto Repair, reported the continuing problems, and received an estimate of $4,165.36 for replacing the mudboat's engine with a rebuilt engine. He then wrote Macro advising it of the problems with the engine and requesting that it pay the cost of repair. Four days later, on September 25, 2007, Mr. Simon spoke by telephone with Shannon Broussard, Macro's operations manager, who asked him to bring the mudboat to Macro's office or shop for it to be inspected. Mr. Simon did not allow the requested inspection.

In February of 2008, Robert's Auto Repair installed a rebuilt engine in the mudboat, and, on February 14, 2008, Mr. Simon paid Robert's Auto Repair $4,419.71. In April of 2008, Mr. Simon sent Macro a demand letter seeking payment for the repairs. When he did not receive payment, he filed the instant suit on April 16, 2008.

Mr. Klenke's testimony concerning the events of July 29, 2007, supported that of Mr. Simon. He further testified that when he rode in the mudboat after the diesel had been removed, the problems remained the same until the engine was replaced. Thereafter, the mudboat ran well. Mr. LaMaison testified that although he was not present on July 29, 2007, he had ridden in the mudboat before that date and observed no problems. He supported Mr. Simon's testimony concerning the test run of September 15, 2007, suggesting that he heard a ticking sound from the engine and observed the engine smoking "just a little bit."

Mr. Courville testified that when Mr. Simon returned the mudboat to him after the test run, he already knew that because the compression in the cylinders was low, the problem was with the rings and pistons. He explained that in his opinion, there was nothing left to do but to but install a rebuilt engine because tearing down the

3

existing engine and replacing the necessary parts would be more expensive than the replacement costs. Although Mr. Courville kept the old engine after installing the rebuilt engine, he removed the accessories he needed on the rebuilt engine, including the intake, the carburetor, the exhaust, the water pump, and the flywheel. In his opinion, the diesel running through the engine caused the damage to Mr. Simon's mudboat, and the only remedy was installation of a rebuilt engine.

After Mr. Simon rested his case, Macro moved for a dismissal of the suit, which the trial court rejected. Damon Raegan, the shop foreman at Sterling Imports in Lafayette, Louisiana, then testified on behalf of Macro as an expert automobile mechanic. Mr. Raegan disagreed with Mr. Courville's opinion, stating that he was not aware of any long-term damage arising from running diesel fuel through a gasoline engine. At the same time, he admitted that when he inspected the damaged engine in mid to late December of 2008, he merely ascertained the size and age of the engine but did not examine the rings or pistons. Mr. Raegan also disagreed with Mr. Courville's assessment that nothing else could have been to done to repair the problems with the old engine. He suggested that an adjustment to the carburetor could have been causing the smoke from the engine and that problem could have easily been solved.

Ricky Daigle, a mechanic with twenty-six to twenty-seven years of experience and Macro's shop foreman, and Mr. Broussard both testified that Marco's shop had repaired a number of vehicles[3] that had received diesel fuel from the same gasoline tank in July of 2007, and that none of these vehicles had suffered any long-term problems or required additional repairs. However, Mr. Daigle acknowledged that his

---

[3]Mr. Daigle suggested that the shop had repaired three or four, and Mr. Broussard suggested that the number was closer to eight or ten.

4

involvement with Mr. Simon's mudboat was nothing more than a glance at the old engine in December of 2008.

After completion of the evidence, the trial court issued oral reasons for judgment, finding that Mr. Simon's mudboat was damaged by the diesel and awarded him $2,557.98 in damages. Mr. Simon has not appealed this award, but Marco has appealed, asserting three assignments of error:

1)    The Trial Court erred by denying Macro's Motion for Directed Verdict. Plaintiff did not carry his burden of proving that the subject engine was destroyed by running diesel through it so as to require replacement.

2)    The Trial Court committed legal error in applying the burden of proof in this case. The Trial Court erroneously held that Macro was required to affirmatively prove that the subject engine was not damaged as alleged rather than requiring Plaintiff to prove his own case.

3)    The Trial Court erroneously held that the doctrine of spoilation of evidence did not apply simply because the subject lawsuit had not yet been filed. Contrary to the Trial Court's holding, the law is clear that if the offending party knows that litigation is imminent, he has a duty to preserve material evidence.

### OPINION

### *Assignment of Error Number One*

Macro first argues that the trial court erred in denying its motion for involuntary dismissal at the close of Mr. Simon's case.[4]  A motion for involuntary

_____

[4]Macro refers, at trial and on appeal, to a motion for directed verdict rather than a motion for involuntary dismissal. However, a motion for a directed verdict, governed by La.Code Civ.P. art 1810, is limited to jury trials. Here, where the trial was a bench trial, the proper motion is one for involuntary dismissal, governed by La.Code. Civ.P. art. 1672(B), which provides:

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

5

dismissal may be granted after the plaintiff has presented his evidence if, "upon the facts and law, the plaintiff has shown no right to relief." La.Code Civ.P. art. 1672(B). A trial court is accorded great discretion in deciding a motion for involuntary dismissal. *Gold, Weems, Bruser, Sues & Rundell v. Granger*, 06-859 (La.App. 3 Cir. 12/29/06), 947 So.2d 835, *writ denied* 07-421 (La. 4/27/07), 955 So.2d 687. This court reviews a trial court's judgment on a motion for involuntary dismissal under a manifest error standard of review. *Kite v. Carter*, 03-378 (La.App. 3 Cir. 10/1/03), 856 So.2d 1271.

Our review of the record convinces us that the trial court did not abuse its discretion in denying the motion for involuntary dismissal. Mr. Simon presented sufficient evidence to establish his claim by a preponderance of the evidence.

### *Assignment of Error Number Two*

Macro next asserts that the trial court erred in its application of the burden of proof, arguing that the trial court required Macro to affirmatively prove that the engine was not damaged as alleged rather than requiring Mr. Simon to prove his own case.

Mr. Simon's suit is a general negligence action under La.Civ.Code art. 2315(A), which provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." In a general negligence action, the plaintiff is required to prove five separate elements:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element).

6

*La Pac Mfg., Inc. v. TCM Mfg., Inc.*, 06-748, p. 6 (La.App. 3 Cir. 12/6/06), 944 So.2d 831, 835-36, *writ denied*, 07-42 (La. 3/9/07), 949 So.2d 445 (citation omitted).

The plaintiff's failure to prove any one of these elements results in a determination of no liability. *Lemann v. Essen Lane Daiquiris, Inc.*, 05-1095 (La. 3/10/06), 923 So.2d 627.

> In a civil suit, the plaintiff bears the burden of proving every element of his case. One who asserts a fact in a civil action must carry the burden of proving that fact by a preponderance of the evidence. Proof by a preponderance of the evidence exists when the evidence, taken as a whole, shows that a fact sought to be proved is more probable than not. "If the party bearing the burden of proof fails to satisfy his burden by the requisite preponderance, his case fails to outweigh his adversary and he necessarily loses." An appellate court will not set aside a trial court's finding of fact unless it is clearly wrong or manifestly erroneous.

*Collins v. McElveen*, 96-633, pp. 3-4 (La.App. 3 Cir. 11/6/96), 682 So.2d 978, 979-80 (citations omitted).

Macro contends that the trial court misapplied the burden of proof on the elements of cause-in-fact and damages, arguing that the trial court "did not weigh the credibility of the experts to chose [sic] Plaintiff's over Macro's. Instead, it accepted all of the testimony and held that since it was at odds, Macro bore the burden of disassembling the engine to affirmatively prove or disprove whether '[Plaintiff's expert] was wrong.'" This argument mischaracterizes the trial court's reasons for judgment. The trial court, in its oral reasons for judgment, found Mr. Courville to be a credible expert, saying "for me to reject Mr. Courville's assertion that what he did was the appropriate matter - - measure, then I'd have to reject his credibility as a mechanic and - - and I - - I don't do that. I - - I know he knows what he's doing as a mechanic."

Mr. Courville's opinions that the engine's problems resulted from running diesel through the motor and that the only way to solve those problems was to install

7

a rebuilt engine were directly contradicted by Mr. Raegan's testimony. However, "[w]here the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1111 (La.1990). "Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which should not be disturbed on appeal in the absence of manifest error." *Hanks v. Entergy Corp.*, 06-477, p. 24 (La. 12/18/06), 944 So.2d 564, 581.

The trial court chose to credit the opinions and testimony of Mr. Simon's expert witness, and we find no merit in this assignment of error.

### *Assignment of Error Number Three*

In its third and final assignment of error, Macro argues that the trial court erred in holding that the doctrine of spoilation of evidence did not apply. Specifically, Macro asserts that Mr. Simon had a legal duty to allow Macro an opportunity to inspect the mudboat and the damaged engine before going forward with replacing the engine. As previously noted, Mr. Broussard had asked Mr. Simon to allow Macro to examine the damaged engine in September of 2007, but Mr. Simon did not bring the mudboat to Macro for an inspection.

"Louisiana jurisprudence holds that when a litigant destroys, conceals, or fails to produce evidence within his or her control, it gives rise to an adverse presumption that had the evidence been produced, it would have been detrimental to the litigant's case." *Allstate Ins. Co. v. Ford Motor Co.*, 00-710, p. 4 (La.App. 3 Cir. 11/2/00), 772 So.2d 339, 342. Further, when a party has notice that certain evidence within its control is relevant to pending or imminent litigation, the party has an obligation to

8

preserve the evidence. *Everhardt v. La. Dep't of Transp. & Dev.*, 07-981 (La.App. 4 Cir. 2/20/08), 978 So.2d 1036. However, courts have consistently recognized that this presumption does not apply when there is a reasonable explanation for the party's failure to produce the evidence. *See Allstate Ins. Co.*, 772 So.2d 339; *Babineaux v. Black*, 396 So.2d 584 (La.App. 3 Cir.1981); and *Everhardt*, 978 So.2d 1036.

Macro argues that it was entitled to inspect the old, damaged engine while it was running on Mr. Simon's mudboat and that when Mr. Simon had the engine replaced before trial, he spoiled the evidence, entitling Macro to the presumption in its favor. However, Mr. Simon did not have an obligation to leave his mudboat in disrepair pending this lawsuit and Macro's inspection pursuant to discovery. Mr. Courville testified that when the engine was replaced, the old, damaged, engine block was kept, mounted on a pallet, and was available for inspection. In fact, Macro sent two mechanics to examine the engine block in December of 2008. The engine block was not in running order, because many of the engine's parts were re-used when installing the new engine.

As the trial court correctly noted, in September of 2007, when suit had not yet been filed, Mr. Simon did not have an obligation to allow Macro to inspect the engine. And although the engine was not in running order in December of 2008, when Macro's mechanics were allowed to inspect the engine, Mr. Simon had a reasonable explanation for the engine's condition: the fact that Robert's Auto Shop used many of the parts from the old engine when installing the rebuilt engine on the mudboat. Given these circumstances, we do not find that the trial court erred in denying Macro the presumption that an inspection of the engine would have been detrimental to Mr. Simon's suit.

### Request for Sanctions

In his brief on appeal, Mr. Simon objects to language in Macro's brief casting aspersions on Mr. Simon's integrity and suggests that sanctions under Uniform Rules—Courts of Appeal, Rules 2-12.4, governing an appellant's brief, "seem to be appropriate." This rule requires, in pertinent part, that:

> The language used in the brief shall be courteous, free from vile, obscene, obnoxious, or offensive expressions, and free from insulting, abusive, discourteous, or irrelevant matter or criticism of any person, class of persons or association of persons, or any court, or judge or other officer thereof, or of any institution.

We agree with Mr. Simon that Mr. Dills, Macro's counsel, violated this rule in his brief, but also note that an appellee's brief must conform to the same requirements. Uniform Rules—Courts of Appeal, Rules 2-12.5.

In its brief, Macro's attorney states that "Plaintiff was engaged in a scam . . . when [Mr. Simon] saw the opportunity for someone else to front the bill to fix [his mudboat], he jumped on it." He further states that "Plaintiff's actions reek of a scam," and that Mr. Simon "was trying to get something for nothing." This language is inappropriate, discourteous, and insulting. *See Stroscher v. Stroscher*, 01-2769 (La.App. 1 Cir. 2/14/03), 845 So.2d 518.

However, we must also note that Mr. Simon responds to these statements by asserting in his brief that "the only time fraud has infected these proceedings is when Ms. Lindsey M. Deblois [another attorney at the firm representing Macro] made knowing false statements of fact to the tribunal," accusing her of including "fraudulent and perjured content" in an affidavit. We find this language to be inappropriate, discourteous, and insulting as well.

10

Uniform Rules—Courts of Appeal, Rules 2-12.4 provides that "[a]ny violation of this Rule shall subject the author, or authors, of the brief to punishment for contempt of court, and to having such brief returned." Although we find that both attorneys have crossed the line of what is appropriate in a brief, we decline to return the briefs or hold the authors in contempt of court under La.Code Civ.P. art. 222(3). Instead, we order that the first line on page one, the last half of line 24 and all of line 25 on page six, the first full sentence on page nine, the second sentence on page eighteen, and the last sentence in footnote four on page eighteen be stricken from the brief filed by Mr. Dills, and that the second paragraph on page nine be stricken from the brief filed by Mr. Simon. We further admonish the attorneys that in filing matters in this court they are expected to act within the bounds of professionalism regardless of their personal feelings arising from the litigation. The intemperate and insulting language directed toward each other is not within those bounds, and we condemn this inappropriate and unprofessional conduct. Such actions have no place in litigation before this court.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgment in all respects. We order that the language described herein be stricken from the briefs filed by the parties and admonish both J. Quentin Simon and Kevin M. Dills for the inappropriate language. We assess all costs of this appeal to the defendant, Macro, Inc.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules—Courts of Appeal, Rules 2-16.2 and 2-16.3.

11