626 So.2d 859 (1993)
ARTIFICIAL LIFT, INC., Plaintiff-Appellee,
v.
PRODUCTION SPECIALTIES, INC., Defendant-Appellant.
No. 93-103.
Court of Appeal of Louisiana, Third Circuit.
November 3, 1993.
Rehearing Denied December 16, 1993.
*860 William E. Logan Jr., Lafayette, for Artificial Lift, Inc.
*861 Kenneth Lloyd Hix, John Bradley Wartelle, Lafayette, for Production Specialties, Inc.
Before GUIDRY, WOODARD and DECUIR, JJ.
GUIDRY, Judge.
This suit concerns a contractual dispute. Plaintiff, Artificial Lift, Inc. (ALI), initiated this action to recover unpaid sales commissions allegedly due from defendant, Production Specialties, Inc. (PSI), pursuant to the terms of a representative agreement. In the agreement, which provided for a one year term from May 11, 1989 to May 10, 1990, ALI became the exclusive Louisiana sales representative for PSI-manufactured gas lift equipment. ALI alleged in its petition that PSI owed it unpaid commissions on seventeen sales invoices.
The trial court determined that ALI was entitled to commissions on fourteen invoices and, accordingly, awarded ALI $26,945.62 plus legal interest from the date of judicial demand until paid. The trial court denied ALI's claim on three invoices.
PSI appealed and ALI answered the appeal. The issues presented by PSI on appeal include whether ALI sufficiently met its burden of proving its entitlement to commissions; whether ALI was entitled to receive commissions on invoices dated after the contract termination date (back end jobs); and, alternatively, whether PSI was entitled to offset commissions paid to ALI on pre-contract invoices (front end jobs) against the commissions due on back end jobs. ALI, in its answer, prayed for an increase in the award to $34,246.59 and the assessment of legal interest from the due date of each invoice instead of the date of judicial demand. For the reasons which follow, we amend the trial court's judgment to increase the award in favor of ALI by $3,128 to $30,073.62. In all other respects, we affirm.

FACTS
At the time of the agreement, PSI was in the business of manufacturing and selling gas lift equipment for use on oil and gas production rigs. The agreement provided that ALI was to be paid on a commission basis for every sale. Specifically, section eight thereof stated as follows:
Commission shall be derived from the attached commission rate sheet which will be based on the "net proceeds" from the sale actually received by Company [PSI] and Representative [ALI] will be paid as such "net proceeds" are received from the customer (purchaser). For the purpose of this agreement, the term "net proceeds" shall mean the net price billed by the Representative [ALI] to the purchaser for the products ... (Emphasis ours)
Under the arrangement, ALI sold the PSI gas lift equipment to a customer and forwarded a purchase order to PSI. PSI then specially manufactured customized equipment ordered (if any) and delivered the equipment to the customer. From the list of equipment delivered, PSI generated an invoice for the order on or closely following the delivery date and sent the invoice to the customer. Once the customer paid PSI the "net proceeds" of the sale, PSI would then pay ALI its commission.
At trial, ALI entered into evidence the invoices which it claimed PSI owed commissions on. In connection therewith, ALI presented the testimony of Dennis McGee, the district manager of ALI's New Orleans office. He testified that, under the representative agreement, the parties contemplated that ALI would receive its commission on a sale when the total invoice price was paid by the customer. This was so even though the commissions were earned before the "net proceeds" payment was received from the customer. According to McGee, PSI agreed to pay commissions to ALI for job orders pending prior to the contract commencement date. However, ALI did not expect to receive commissions on job orders for wells that were eventually abandoned by the customer before the standard (non-customized) equipment was used. If customized equipment was ordered by the customer, then the customer was required to purchase it and ALI would receive its commission.
The invoices upon which ALI claimed commissions were introduced into the record in *862 connection with the testimony of Herman Gassiott, a one-third equity owner and the president of ALI. Gassiott testified that the commissions claimed by ALI on the seventeen invoices had not been paid by PSI.
Charles Miller, an ALI salesman, testified that prior to the effective date of the representative agreement, he was employed as a salesman by PSI. When the marketing situation changed, he began to work for ALI. He testified that, in his opinion, the typical sale was not completed until the customer's order was received by PSI and the equipment was manufactured. According to Miller, ALI's commission was earned when the equipment was delivered to the rig site and the delivery ticket was signed. His opinion was based on customary practices in the oil industry, not on any personal knowledge of the PSI-ALI contractual arrangement.
In ALI's case-in-chief, it also presented the testimony of George Arlie Adams, PSI's former vice president of sales. He testified that his job was to work with ALI to develop and facilitate oil industry contacts, but ALI ran the separate marketing business on its own. Adams stated that a job order was normally invoiced by PSI after the equipment was delivered and a signed delivery ticket was sent to the Lafayette PSI office.
Both Wayne Mabry, PSI's executive vice president and general manager, and Katy Hinze, PSI's secretary/bookkeeper, testified that Gerald Hebert, PSI's president, had the sole authority to figure commissions owed to ALI. Hebert, however, was not subpoenaed by either party and did not testify concerning whether PSI was ever paid by the customers for the invoices at issue.
After ALI rested its case, PSI moved for involuntary dismissal which the trial court denied. Thereafter, PSI rested its case without presenting any evidence in defense of ALI's claim for commissions. In his closing argument to the trial court, PSI's counsel presented the reasons for resting without presenting a defense. He argued that ALI failed to meet its burden of proof by failing to establish that PSI was ever paid by customers on any of the invoices at issue. He argued that actual payment of "net proceeds" by customers to PSI was a condition precedent to ALI's right to receive commissions on the "net proceeds" paid to PSI by the customers.
The trial court determined that ALI sufficiently proved its entitlement to commissions on fourteen of the invoices.

BURDEN OF PROOF
On appeal, PSI reurges its contention that ALI failed to prove that PSI was ever paid on any of the invoices at issue, which proof would establish ALI's entitlement to commissions. In doing so, PSI relies on the trial judge's statement in a supplemental minute entry, to-wit: "At trial, there was no evidence offered to establish when, if ever, Production Specialties was actually paid".
A party who demands performance of an obligation must prove the existence of the obligation by a preponderance of the evidence. La.C.C. art. 1831; Bordlee v. Pat's Construction Company, Inc., 316 So.2d 16 (La.App. 4th Cir.1975). The burden of going forward with evidence is initially on the plaintiff. When he establishes a prima facie case of the existence of the obligation, the burden shifts to the defendant. If the defendant casts doubt upon the reality of the obligation, the burden shifts back to the plaintiff. Moody v. Gossen, 125 So.2d 264 (La.App. 3rd Cir.1960). Prima facie evidence is defined as evidence sufficient to establish a given fact and which, if not rebutted or contradicted, will remain sufficient. Humphries v. Louisiana Department of Public Works, Division of Transportation, 545 So.2d 610 (La.App. 3rd Cir.1989), writ denied, 548 So.2d 1249 (La.1989). Once a prima facie case has been established by the plaintiff by a preponderance of the evidence, the burden shifts to the defendant. Further, one who asserts a fact must carry the burden of proving that fact by a preponderance of the evidence. Dupre v. Joe's Riverside Seafood, Inc., 578 So.2d 158 (La.App. 1st Cir.1991). An exception to this general rule exists where the asserting party's opponent is the most cognizant of facts necessary to decide the issue. Peters v. Great Atlantic and Pacific Tea Co., 72 So.2d 562 (La.App. 2d Cir. 1954). While the general rule of evidence *863 pertaining to proof of a negative places the burden of proof on the party seeking to prove such fact, there is an exception drawn when the matter is peculiarly within the knowledge of the adverse party. Travelers Indemnity Co. v. Ducote, 368 So.2d 1119 (La.App. 3rd Cir.1979), writ granted, 370 So.2d 574 (La.1979), reversed on merits of case, 380 So.2d 10 (La.1979).[1]
In the case sub judice, ALI presented the representative agreement, the actual invoices and testimony which established the nature of the business arrangement existing between ALI and PSI. It also established, without contradiction, that, at the very latest, commissions were earned by ALI on the respective invoice dates. ALI clearly presented prima facie evidence of the existence of an obligation on the part of PSI to pay commissions on the "net proceeds" of the sale. At this point in the proceedings, it was incumbent upon PSI to cast doubt upon the existence of the obligation. This it did not do. Thus, ALI sufficiently established the existence of PSI's obligation to pay ALI commissions on the individual sales.
As PSI argues, however, ALI did not prove, under section eight of the agreement, that PSI "actually received `net proceeds' ... from the customer", which event triggers ALI's entitlement to be paid commissions. PSI asserts that the above quoted phrase effects a suspensive condition, as contemplated by La.C.C. art. 1767 et seq., which must occur before ALI can be paid. PSI's contention rests on the temporal distinction between the date upon which commissions are earned and the date upon which ALI is entitled to be paid under the agreement. Clearly, given the business arrangement and course of dealing between the parties, the former date always preceded the latter.
Whether or not PSI was actually paid "net proceeds" from the customers to which ALI sold the PSI equipment is a factual issue which was peculiarly within the knowledge of PSI. It was clearly the party most cognizant of facts necessary to decide the issue. The actual PSI invoices indicate that the customers who ordered equipment in the transactions at issue included Chevron, Greenhill Petroleum Company and B & F Petroleum. The invoices upon which the court awarded recovery were dated from April 12, 1990 through July 30, 1990. Trial of this matter was held on October 28, 1992, well over two years after the last invoice date. Clearly, because of the business arrangement which called for PSI to be paid directly by the customers, PSI was uniquely situated during the interim period as the party most capable of determining whether or not it had in fact been paid. However, PSI offered no proof to refute the allegation that it received payment from its customers. While it is axiomatic that plaintiff generally bears the burden of proving both the existence of the obligation and its resulting entitlement to payment therefor, we feel that, under the particular facts and circumstances of this case, it was incumbent upon PSI, pursuant to the evidentiary exception enunciated in Travelers Indemnity Co. and Peters, supra, to present prima facie evidence that it had not received payment of "net proceeds" from sales to the customers. PSI failed to do this.
In Southern States Masonry, Inc. v. J.A. Jones Construction Co., 507 So.2d 198 (La. 1987), the Supreme Court construed a very similar "pay when paid" clause within the context of a general contractor-subcontractor relationship. The clause at issue in that case provided, in pertinent part:
"... Contractor shall pay to Subcontractor, upon receipt of payment from the *864 Owner, an amount equal to the value of Subcontractor's completed work, to the extent allowed and paid by Owner on account of Subcontractor's Work ..."
The case involved work performed for the Louisiana World Exposition (LWE), the "owner", which, at the time of the litigation, had filed for protection from its creditors under the United States Bankruptcy Code. The court held that the clause expressed a term for payment, not a suspensive condition which must occur before the subcontractor had a right to payment from the contractor for its completed work. The clause "... merely dictated when the contractor's payment should occur". Id., at 203. This ruling was based primarily on the fact that the parties did not specifically contemplate or express in the contract that the subcontractor would bear the risk of LWE's insolvency. The court reasoned that, at the time of contracting, the parties considered payment by LWE to be a reasonably certain future event which, to the dismay of the parties, did not occur. Thus, the contractor was bound under the contract to pay the subcontractor regardless of whether or not the LWE first paid the contractor.
Compare this with the result in C. Bel for Awnings, Inc. v. Blaine-Hays Construction Co., 532 So.2d 830 (La.App. 4th Cir.1988), wherein our brethren of the Fourth Circuit, under substantially similar factual and contractual circumstances, ruled that the general contractor was not absolutely bound to pay the subcontractor. The court distinguished its case from Southern States Masonry, supra, which it acknowledged as controlling, on the basis of a subsequent agreement executed between the general contractor and subcontractor after LWE failed to make the required payments to the general contractor. The subsequent agreement, in expressly referring to the original contractual payment provision, contained the following clause: "... Subcontractor is not entitled to receive payment from Blaine-Hays until Blaine-Hays receives payment from LWE". C. Bel For Awnings, Inc., supra, at 832. The court concluded that, under the circumstances, the parties did not consider payment by LWE to be a reasonably certain event and the "pay when paid" clause was a suspensive condition to payment. No such subsequent agreement was executed in the present case.
Aries Marine Corporation v. Blue Streak Marine, Inc., 580 So.2d 412 (La.App. 4th Cir.1991), writ denied, 588 So.2d 1112 (La. 1991), involved a suit by a joint venturer for sales commissions allegedly owed by a withdrawing joint venturer. The contract provided that the joint venture earned a 2.5% commission upon receipt by the "owner/operator" (the joint venturer which consummated the sale) of the total amount owed from the "user" (customer). Once again, the Fourth Circuit distinguished this case from Southern States Masonry on the basis that the parties contractually varied the time at which the commission would typically be earned. The court concluded that the payment of commission was dependent upon an uncertain future event, the commission being earned when the joint venturer was paid by the user. In this respect, the clause was likewise found to be a suspensive condition to payment of the commission.
We conclude that the payment clause in the case sub judice is governed by the construction of the "pay when paid" clause and the result reached by the Louisiana Supreme Court in Southern States Masonry, supra. It is clear that the parties contemplated that customer payments were reasonably certain future events. This is true especially in light of the ability of large oil corporations such as Chevron USA, Greenhill Petroleum and B & F Petroleum to pay such relatively small invoice amounts as compared to the total cost of operating an oil or gas rig. Unlike in C. Bel for Awnings, Inc., supra, there was no agreement executed between PSI and ALI subsequent to the default of a customer wherein ALI specifically agreed to forego payment of commissions until the customer paid PSI. Additionally, unlike in Aries Marine Corporation, supra, the agreement did not contractually vary the time at which the commission was earned. We can perceive of no reason to create another exception, under these circumstances, to the general rule of Southern States Masonry construing a similarly worded "pay when paid" clause. Under the holding of Southern States Masonry, PSI is bound to pay ALI its commissions earned *865 (as evidenced on the sales invoices and commission rate sheet) regardless of whether PSI first receives payment of the "net proceeds" from the customers.
In sum, we conclude that ALI made a prima facie showing of its entitlement to commissions on the invoices by a preponderance of the evidence which when left unrebutted is sufficient to establish its entitlement to commissions on the individual sales. However, in any event, we conclude that the rationale of Southern States Masonry, supra, is applicable and dictates the result reached by the trial court.

BACK END JOBS
Alternatively, PSI contends that the trial court erred in awarding ALI commissions on four invoices dated after the termination date of the representative agreement. Specifically, the following invoices are called into question:

Invoice Number Date Commission
1400 5/21/90 $ 2,600.10
1413 6/1/90 2,726.45
1417 6/1/90 2,520.20
1453 7/30/90 3,848.00
 __________
 Total $11,694.75

An obligor is liable for the damages caused by his failure to perform a conventional obligation. La.C.C. art. 1994. Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived. La.C.C. art. 1995.
It is undisputed that PSI did not pay commissions to ALI on these invoices prior to trial. The invoices were admitted into evidence in connection with the testimony of Herman Gassiott. He stated that the basis for claiming commissions on these invoices was "the pending list Mr. (Dennis) McGee and supposedly (George) Arlie Adams worked on".
McGee, ALI's district manager in New Orleans, testified that, when he was notified of the impending contract termination in May of 1990, he contacted Adams, PSI's vice-president of sales, and asked Adams how PSI wanted to handle the pending jobs. According to McGee, PSI agreed to pay ALI commissions on the pending job orders once the equipment was delivered and PSI was paid the "net proceeds" by the customers. In other words, the payment terms of the representative agreement were extended to cover these pending yet incomplete job orders.
The pending job orders list was entered into evidence as plaintiff's exhibit number four. On the pending list, McGee omitted the Chevron Bay Marchand # 28 job order (evidenced by invoice # 1413). He stated that, because of this error, he and Adams agreed to include the Chevron Bay Marchand # 28 job on the pending list in exchange for one Texaco and three Greenhill Petroleum jobs that had been included on the pending list. Thus, in addition to invoice # 1413, the pending list included the following jobs: South Pass # 62 (invoice # 1400), Bay Marchand S/L 1365 (invoice # 1417), and Bay Marchand # 21 (invoice # 1453). The pending list, which is handwritten and somewhat sketchy, does not contain a written agreement between PSI and ALI which provides for payment in accordance with the representative agreement on the pending job orders. Apparently, the agreement which McGee testified to was never reduced to writing.
When presented with the pending list at trial, Adams acknowledged receiving it from McGee. He stated that "... those jobs were set up in the [PSI] shop, ready to go. It was just a matter of delivery". Adams further stated that, after the oil company project engineer ordered the necessary gas lift equipment, a delay of typically three months would occur between approval of the design by the engineer and delivery of the equipment. He stated that, at the time of set up, a delivery ticket was generated. When the equipment was delivered, the ticket was forwarded to PSI's Lafayette office where the invoice was created from the delivery ticket. Thus, at the time of contract termination, the pending jobs equipment only awaited delivery to the rig. The work of ALI, in selling the equipment and securing the order for PSI to fill, was complete.
Under these circumstances, we cannot say that the trial judge erred in awarding ALI commissions on the four back end jobs. ALI sufficiently proved that PSI agreed to pay commissions on the pending jobs. Adams *866 admitted having seen the pending list prepared by McGee, and he failed to contradict McGee's testimony that PSI agreed to pay ALI commissions for the pending jobs. The work of ALI in securing the four separate sales, each of which are dated within the three month period following the contract termination date, was complete as of May 10, 1990. For these reasons, the trial court did not err in awarding commissions on the back end jobs.

OFFSET FOR FRONT END JOBS
PSI claimed the right to offset any award to ALI with commissions previously paid to ALI on orders which originated with and were developed by PSI salesmen prior to the commencement date of the representative agreement, May 11, 1989. The invoices generated by these sales were dated after the commencement date. The trial court denied PSI's claim for offset, stating that PSI did not prove its entitlement thereto by a preponderance of the evidence.
On appeal, PSI urges that, if this court affirms the commissions awarded on back end jobs, then it would be unfair and illogical to penalize PSI further by not allowing the offset for front end jobs. PSI contends that an award of back end commissions must necessarily be grounded on a determination that these jobs were "pending" on the contract termination date, and that the date upon which the jobs became "pending" was the critical point in determining whether commissions were due. PSI argues that, logically, the front end jobs, which were "pending" prior to the commencement of the contractual arrangement, should thus not be compensable to ALI.
At trial, PSI presented twelve invoices dated from May 17, 1989 through December 5, 1989 upon which it based its claim of offset. As correctly stated by PSI, these orders were "pending" prior to the effective date of the PSI-ALI representative agreement, May 10, 1989. They were initiated by PSI salesmen before ALI assumed the sales and marketing of PSI equipment. However, it was also undisputed at trial that PSI agreed to pay ALI commissions on the twelve invoices which form the basis of PSI's offset claim. Even Adams, PSI's vice-president of sales, testified that PSI agreed to pay ALI commissions on these orders. Ronnie Massicot, ALI's secretary-treasurer, stated that, in exchange for the right to receive commissions on these front end jobs, ALI agreed to hire the sales force formerly employed by PSI. Gassiott, ALI's president, confirmed Massicot's recollection of the contract negotiation and formation.
The evidence in the record clearly indicates that PSI agreed to pay ALI commissions for front end jobs which were indisputably pending through the efforts of PSI salesmen before and on the date of the contract. This was agreed to without the necessity of determining which party, PSI or ALI, had actually "earned" the commission. In our view, it is preferable to treat the front end commissions separately from the back end commissions. PSI obligated itself to pay the front end commissions and, when it paid them, its obligation was extinguished. As decided above, ALI sufficiently proved that PSI obligated itself to pay the back end commissions. This decision does not turn on a determination that commissions were uniformly payable when the equipment orders attained a "pending" status. On the contrary, it is based upon our determination that PSI agreed, on two separate occasions, to pay ALI both front end and back end commissions. Under these circumstances, the trial court correctly concluded that PSI did not sufficiently prove its entitlement to the offset claimed.

DISALLOWED INVOICES
The trial court disallowed ALI's claim for commissions on invoices 1267 ($1,470), 1317 ($5,052.64), and 1318 ($630). It did so without giving any specific reasons for denying ALI commissions on these invoices. ALI claims that the court erred in not awarding commissions on these job orders. We examine each invoice separately.
Invoice # 1267. This invoice, dated January 22, 1990, shows a commission due to ALI of $1,470. The equipment listed thereon was sold to B & F Operating Company. This invoice was the only one presented which *867 ALI sought to prove payment by the customer (B & F) of the net proceeds to PSI. The trial judge properly denied the attempt to introduce cancelled checks written on a B & F account for lack of a proper foundation, i.e., no person from B & F was present to attest to the circumstances surrounding payment. Gassicot testified that ALI had not received payment of its commission on this invoice. There is no evidence in the record to indicate that the commission owed on this invoice was not due. It was generated during the contract period, and Gassicot's testimony concerning nonpayment by PSI was uncontradicted. Applying the legal principles enunciated above on the burden of proof issue, we amend the award to include this $1,470 commission.
Invoice #1317. This invoice, dated March 15, 1990, shows a commission due of $5,062.64. It is subject to credit memorandum # 1317CM for the full amount of the invoice, $20,336. McGee testified that the equipment ordered was set up and delivered to the customer, Chevron. Chevron initially paid for the equipment, but experienced trouble with the well and sent the equipment back to PSI. At that point, PSI issued the credit to Chevron. According to McGee, the equipment remained at the ALI-PSI shop at least until he left their employment. He further testified that, once the credit memorandum was issued to Chevron, ALI was only owed $1,028 for load test mileage and labor services which are not subject to the credit. Gassiott testified that, in his view, the entire $5,062.64 was owed to ALI because the equipment was delivered and Chevron paid for it. Although PSI issued a credit to Chevron against future purchases, no money was returned to Chevron.
The record reveals that the equipment was returned to the ALI-PSI shop and PSI issued a credit to Chevron for the full purchase price. Under these circumstances, ALI is not entitled to its commission for equipment returned to PSI by the customer. As to McGee's claim that PSI owed ALI $1,028 for load test mileage and labor services, a thorough review of the representative agreement reveals that the parties did not contemplate therein which party would be liable for such charges. However, as part of the commission rate sheet, the parties agreed that PSI would pay ALI for "[M]andrel testing, meals and lodging, mileage, service charges, and consultation charges". Gassiott testified that mileage and labor are not refundable to the customer despite PSI's issuance of a credit thereto for the entire invoice amount. Under these circumstances, an award to ALI of $1,028, as testified to by McGee, is reasonable and appropriate.
Invoice #1318. This invoice, dated March 16, 1990, shows a commission due of $3,826.80. Like invoice #1317, it is also subject to a credit memorandum, # 1368CR, which shows a $3,196.80 credit against the commission due. The net commission due is thus $630. According to Gassiott, this amount also represents ALI mileage and load and test labor not refundable to the customer. Under the terms of the commission rate sheet, it is clear that PSI is liable to ALI for these charges whether the equipment is used by the customer or returned intact. Accordingly, we award ALI the $630 claimed for mileage and labor as documented in this invoice and credit memorandum.

LEGAL INTEREST
The final issue remaining is ALI's contention that the trial court should have awarded legal interest from the date of each invoice instead of from the date of judicial demand. La.C.C. art. 2000 provides, in pertinent part:
When the object of performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by Article 2924. (Emphasis ours)
All sums due on a contract bear interest at least from the date of judicial demand. Land and Offshore Co. v. Martin, 469 So.2d 1177 (La.App. 3rd Cir.1985). In AcadiEnergy, Inc. v. McCord Exploration Co., 596 So.2d 1334 (La.App. 3rd Cir.1992), this court stated that, in a suit resulting from a breach of contract, legal interest attaches from the date of judicial demand.
*868 In the case sub judice, PSI became obligated to pay ALI commissions due, at the latest, on the date that the PSI invoice was generated. While PSI was so obligated, the debt was not technically "due" on that date under the terms of the contract but rather on the date the invoice was paid. It is unclear from the record when each particular commission became due. For these reasons, the trial court did not err in awarding legal interest from the date of judicial demand until paid.

DECREE
For the above and foregoing reasons, the trial court's judgment in favor of plaintiff, Artificial Lift, Inc. is amended to reflect an increase of $3,128 in the award. Judgment is hereby rendered in favor of Artificial Lift, Inc. and against Production Specialties, Inc. in the amount of $30,073.62. In all other respects, the judgment is affirmed. All costs of these proceedings are assessed against defendant-appellant, Production Specialties, Inc.
AFFIRMED AS AMENDED.
NOTES
[1] The precise issue on the merits presented in Travelers was whether a surety (Travelers) which issues a bond pursuant to offers of indemnity (wherein certain parties agreed to hold the surety harmless in the event the surety is required to pay on the bond) must also give timely notice of acceptance of the potential indemnitor's offer. This court held that such notice of acceptance was necessary on the part of the surety before it could seek indemnity from the parties who had offered to indemnify the surety. The Supreme Court reversed, holding that the parties consented to the formation of the indemnity contract by the issuance of the bond as described in the indemnitor's offer without the necessity of the surety's subsequent notification of acceptance. The evidentiary principle relied on by this court was not reversed by the Supreme Court and, in our opinion, remains a viable rule of evidence.