STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-190

SUCCESSION OF MARY AGNES CLARK

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 58338
HONORABLE DERRICK D. KEE, DISTRICT JUDGE

**********

D. KENT SAVOIE
JUDGE

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.

MOTION FOR PARTIAL DISMISSAL GRANTED;
REVERSED IN PART AND RENDERED;
VACATED IN PART AND REMANDED WITH INSTRUCTIONS;
AND AFFIRMED IN PART.

**Winfield E. Little, Jr.**
**Attorney at Law**
**616 Broad Street**
**Lake Charles, LA 70601**
**(337) 430-0907**
**COUNSEL FOR APPELLEE:**
**Larry D. Clark**

**George D. Fagan**
**Adam D. Whitworth**
**Leake & Anderson**
**1100 Poydras Street, Suite 1700**
**New Orleans, LA 70163**
**(504) 585-7500**
**COUNSEL FOR APPELLANTS:**
**Laura Clark Rogers**
**Lynn Clark-Shoemaker**
**Melissa Clark Thorpe**

**Lisa Clark Lorman**
**In Proper Person**
**7895 W. Trail North Drive**
**Littleton, CO 80125**

**Shelby Fruge**
**In Proper Person**
**1308 Waverly Street**
**Lake Charles, LA 70605**

**Deanna Fruge**
**In Proper Person**
**1308 Waverly Street**
**Lake Charles, LA 70605**

**SAVOIE, Judge.**

Laura Clark Rogers, Lyn Clark-Shoemaker, and Melissa Clarke Thorpe (collectively, "RST parties"[1]) are legatees of Mary Agnes Clark's ("Ms. Clark's") 2017 Will. They appeal the trial court's Final Judgment of Possession rendered November 17, 2021. In response, Appellee Larry D. Clark ("Larry") has filed a motion to partially dismiss the RST parties' appeal.

For the reasons that follow, we grant Larry's motion to partially dismiss the appeal, reverse in part and render judgment, vacate in part and remand with instructions, and affirm in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The decedent, Ms. Clark, executed a Last Will and Testament on January 1, 2017 ("the Will"). Therein, she left all of her property to her four step-granddaughters, including the three RST parties, as well as to her former neighbors, Shelby Fruge and Deanna Fruge ("the Fruges"). The Will also named Ms. Clark's step-nephew, Larry, as the independent administrator.

Ms. Clark passed away in Lake Charles, Louisiana, on August 17, 2018. On August 29, 2018, Larry filed a Petition for Probate, asking the trial court to admit the Will to probate and recognize him as the independent administrator of the estate. The trial court entered an order as prayed for and issued Letters of Independent Administration.

On May 7, 2020, Larry filed a sworn detailed descriptive list ("DDL") listing property comprising Ms. Clark's estate. In addition, the DDL expressly listed a Hancock Whitney account ("HW account") with a balance of $122,016.52

---

[1] The parties referred to these parties collectively as RST parties in the trial court and in their briefs to this court. Therefore, we will also refer to them as the RST parties.

as "Property Claimed to be not part of the Estate of [Ms. Clark]." Larry explained the basis of the omission in his April 29, 2020 affidavit attached to the DDL. According to Larry, Ms. Clark gifted him the HW account by making him a co-owner with survivorship benefits, the account was subject to Mississippi law, and therefore he became the sole owner of the account upon Ms. Clark's death.

On July 30, 2020, the RST parties filed a Motion to Traverse and Objections to Larry D. Clark's Adverse Claim Against the Succession, Motion to Remove the Executor and His Counsel, Motion to Appoint a Replacement Executor, and Motion for Other Relief. Therein, the RST parties sought a judgment to include the HW account as part of Ms. Clark's estate. They further sought judgments removing Larry as independent administrator, requiring Larry to render an account and report of his work, appointing a replacement executor, and terminating attorney Winfield Little's representation of Larry.

A hearing on the RST parties' motions was held on April 21, 2021. The trial court rendered oral reasons for ruling on June 1, 2021, and then signed a judgment on June 29, 2021, denying all of the RST parties' motions filed July 30, 2020.

On August 12, 2021, Larry filed a Petition Filing Final Tableau of Distribution, Final Accounting and for Possession. He attached thereto a Final Tableau of Distribution and an Amended Final Accounting, which he sought to have approved by the trial court and homologated. He further requested that he be discharged as independent administrator and that the succession be closed.

The Amended Final Accounting reflected that the value of the funds held in the hands of the independent administrator was equal to the cash value shown on the May 7, 2020 DDL, with the exception of a minor correction to the amount of a refund that had been deposited into the estate's account. It further reported the

2

value of a Morgan Stanley brokerage account through June 30, 2021, as well as interest deposited into the estate's Chase Bank account through June 23, 2021. The Amended Final Accounting also listed debts and expenses paid, including $51,607.00 in attorney fees paid to Mr. Little from the estate's Chase Bank account, and Larry's executor's fee of $96,378.30. According to the Amended Final Account, the net value of the estate available for distribution in accordance with the Will was $4,118,530.61.

On August 26, 2021, the RST parties filed Objections to the Executor's Petition for Possession, Amended Final Accounting, and Tableau of Homologation. They asserted that they objected for the same reasons set forth previously and ruled on by the trial court in June 2021. They further objected to the amount of attorney fees and costs paid to Larry's counsel because documentation supporting the fees and costs incurred was not provided, and also because it included fees and costs associated with Larry's personal claim to the HW account. The RST parties also asked the trial court to compel Larry and his counsel to produce itemized statements and invoices supporting the legal fees and costs paid for by the estate.

The parties agreed to submit the matters in dispute "without the necessity of the Court conducting a contradictory hearing . . . while preserving the RST Parties' rights of appeal with respect to matters described . . . in the Court's June 29, 2021 Judgment[.]"

Ultimately, the November 17, 2021 judgment overruled the RST Parties' "original and continuing objections" to Larry's August 12, 2021 petition "for the same reasons set forth in the Court's June 29, 2021 Judgment . . . and also stated in the Court's Reasons for Judgment communicated during the June 1, 2021 Zoom conference and hearing[.]"

The November 17, 2021 judgment also denied the RST parties' request to compel Larry to produce supporting documentation for legal services and costs that Mr. Little billed to the Succession because the RST Parties had not served formal written discovery requesting that information, and it further stated that Larry had the lawful right to use succession funds to pay attorney fees and costs incurred in defending against the RST parties' challenges to the DDL.

The judgment also approved and homologated the Amended Final Accounting and Tableau of Distribution and transferred ownership of Ms. Clark's entire estate to the legatees in the respective proportions provided by the Will. In addition, the judgment ordered that $25,000 be transferred to the trust account of Larry's counsel for potential attorney fees incurred in connection with an appeal, and it provides specific instructions with respect to the disbursement of those funds.

The RST parties appeal and submit the following as assignments of error:

1. Whether the District Court erred by finding that Larry D. Clark became the sole owner of the [HW] Account upon the death of the decedent, Mary Agnes Clark?

2. Whether the District Court erred by failing to disqualify Larry D. Clark as Executor due to conflicts presented by his claim for the [HW] Account and his duty to defend against the claim as the Executor, his use of Succession monies to pay for his pursuit of his claim to the HW Account, his unreasonable delays in closing out the Succession, and his other conduct?

3. Whether the District Court erred by failing to disqualify Winfield E. Little, Jr. from concurrently representing Larry D. Clark both as the Executor for the Succession and for Larry's [claim] for the [HW] Account?

4. Whether the District Court erred by finding that Larry D. Clark had the lawful right to use Succession funds to pay for the attorney fees and costs to prosecute his claims for the [HW] Account and further erred by approving the executor's fee claimed by and paid to the Executor Larry D. Clark?

4

5. Whether the District Court erred by refusing to compel the Executor to account for and produce or turn over to the RST Parties any documents describing bills issued and payments received by Winfield E. Little, Jr., Esq. for his services to Larry D. Clark as Executor and with respect to his claim regarding the [HW] Account, and/or produce any other documents?

6. Whether the District Court erred by failing to: award any relief allowed by Louisiana Code of Civil Procedure Article 3222 or any applicable law, including assessing the Executor at twenty percent interest per annum on the $122,016.52 amount in the HW Account that was never deposited into the Succession account; award special damages to the RST Parties for their attorney's fees and costs as well as for the attorney's fees and costs that the Succession paid to Winfield E. Little, Jr., Esq. in connection with the [HW] Account claim and/or this appeal; and/or dismiss Larry as the Executor for his failure to turn over the funds in the [HW] Account and/or for his other conduct.

## MOTION FOR PARTIAL DISMISSAL OF APPEAL

Larry has filed with this court a motion to partially dismiss the appeal. He argues that the RST parties' appeal should be dismissed to the extent it seeks review of the trial court's June 29, 2021 judgment denying the RST parties' motion to remove Larry as independent administrator. He notes that that judgment was not appealed within the 60-day delay allowed for devolutive appeals as set forth in La.Code Civ. P. art. 2087.

"Appeals from orders or judgments rendered in succession proceedings shall be governed by the rules applicable to appeals in ordinary proceedings, except that an order or judgment confirming, appointing, or removing a succession representative, or granting an interim allowance under Article 3321 shall be executed provisionally, notwithstanding appeal." La.Code Civ.P. art. 2974.

"This court's appellate jurisdiction extends only to final judgments and interlocutory judgments expressly provided by law. La.Code Civ.P. art. 2083."

*Harrison v. Louisiana Gymnastics Club, LLC*, 21-632, p. 2 (La.App. 3 Cir. 2/23/22), ___ So.3d ___.

> The [Louisiana] Code of Civil Procedure grants the right to an immediate appeal of certain judgments rendered in succession proceedings. . . . See La. Code Civ. Pro. art. 3308 (judgment homologating tableau of distribution may be suspensively appealed), La. Code Civ. Pro. art. 3337 (judgment homologating final account is a "final judgment"), La. Code Civ. Pro. arts. 2122 and 2974 (governing appeals of orders appointing or removing a succession representative); see also *In re Succession of LeBouef*[,] 13-0209 (La. App. 1 Cir. 9/9/14), 153 So.3d 527, 533; *Succession of McLean*, 26,566 (La. App. 2 Cir. 3/1/95), 651 So.2d 920, 926.

*Succession of Jaga,* 16-1291, pp. 3-4 (La.App. 1 Cir. 9/15/17), 227 So.3d 325, 327-328.

In *In re Succession of LeBouef*, 13-209, p. 8 (La.App. 1 Cir. 9/9/14), 153 So.3d 527, 533, the court read La.Civ.Code arts. 2122 and 2974 as granting the right to appeal judgments appointing or removing succession representatives, noting that such a reading "is in conformity with the clear language and placement of those articles, [and] it also comports more reasonably with the rules of logic than a conclusion to the contrary." The *LeBoeuf* court further stated:

> Louisiana Code of Civil Procedure art. 2122 provides that a judgment appointing or removing a legal representative "shall be executed provisionally, notwithstanding an **appeal** therefrom." (Emphasis added.) The article also addresses the legal consequences that follow when a trial court judgment appointing a legal representative is vacated "**on appeal**." (Emphasis added.) Additionally, La. C.C.P. art. 2974 provides that "**[a]ppeals**" from judgments rendered in succession proceedings are governed by the same rules applied to appeals in ordinary proceedings, "**except that an order or judgment confirming, appointing, or removing a succession representative** . . . shall be executed provisionally, **notwithstanding appeal**." (Emphasis added.) The article further provides that "[t]he acts of a succession representative shall not be invalidated by the annulment of his appointment **on appeal**." (Emphasis added.)

> The only logical interpretation to be drawn from the use of the particular term "appeal" in these provisions is that Articles 2122 and

2974 contemplate that appeals are authorized from judgments appointing or removing succession representatives. Any other interpretation would render the repeated use of the word "appeal" in these articles meaningless.

*Succession of LeBeuef*, 153 So.3d at 533 (emphasis in original).

Similarly, in *Succession of Simpson*, 311 So.2d 67 (La.App. 2 Cir.), *writ denied*, 313 So.2d 839 (La.1975), the court found that a judgment denying a Motion to Remove the Executor was final and not timely appealed, and therefore it was not properly before the court in connection with the appeal of a subsequent judgment.

In the instant case, the June 29, 2021 judgment denying the RST parties' motion to remove Larry as the independent administrator was immediately appealable but not appealed within the delays allowed by law. Therefore, it is not subject to review by this court. Larry's motion to partially dismiss the appeal is hereby granted to the extent the appeal seeks review of the trial court's June 29, 2021 judgment denying the RST parties' motion to remove Larry as independent administrator, and we will not consider the RST parties' second assignment of error.

## ON THE MERITS

### The HW Account

In their first assignment of error, the RST parties argue that the trial court erred in concluding that the HW Account was not part of Ms. Clark's estate.

Larry testified at the April 21, 2021 hearing that he is an attorney licensed to practice law in Oklahoma and Texas. In his April 29, 2020 affidavit, which was attached to the May 7, 2020 DDL and submitted as evidence over objection at the hearing, Larry explained that he became Ms. Clark's power of attorney after Ms.

Clark's husband's death in 1992, and that beginning in 1993, Ms. Clark "started adding affiant [Larry] to all of her accounts as co-owner with right of survivorship." Larry further stated in his affidavit that, while Ms. Clark had told him she did not want to include him in her will, "she wished to take care of affiant 'in another way' by making him a gift of the bank accounts by making him co-owner with survivorship benefits."

Larry's affidavit also states that "Mary told affiant she wanted to take care of him outside of her will and in a manner he could enjoy while she was living and upon her death by placing affiant on all but one of her accounts[,]" namely, a Morgan Stanley account on which Larry was named as a power of attorney.

Larry's affidavit also mentions an account at Calcasieu Marine Bank that was created in 1993. The affidavit states that Ms. Clark "gifted to, and placed affiant [Larry] as an owner on the Calcasieu Marine National Bank [account] in early March of 1993[,]" that Ms. Clark had treasuries deposited into that account, and that, as a gift, Ms. Clark made Larry a "co-owner" of those treasuries. A copy of a new account application for a Calcasieu Marine Bank account that was dated March 8, 1993, and signed by Ms. Clark and Larry, was admitted into evidence at the hearing over objection by counsel. The application notes that the account was opened as "Joint with Survivorship" and that the account agreement was governed by Minnesota law. No other documents or statements concerning the Calcasieu Marine Bank account and/or funds transferred into or out of the account were submitted into evidence.

Larry's affidavit also explains that, "upon knowledge and beliefe [sic], Calcasieu became Hibernia National Bank and finally Capital One. When

Hibernia closed, Mary and affiant decided to close that account and move the money to Whitney National Bank, now Hancock Whitney."

Larry further testified at the hearing that "when it went to Capital One [A]unt Mary was like, okay, I'm done. I'm going to switch to a different bank. And so at that point in time she went to Whitney; and I don't -- my memory's not good enough for that date."

Larry also testified that he was not present when Ms. Clark opened the HW account, that Ms. Clark opened the account at a branch in Lake Charles, Louisiana, and that Ms. Clark wrote a check to open the account. Larry stated: "I was added as a signatory and as -- the account was opened as a joint account, joint tenancy, with right of survivorship; and she sent those documents to me in Oklahoma to sign." Larry testified, however, that he did not have those documents. There was also testimony that the account was used to pay Ms. Clark's expenses and that Ms. Clark made payments from the account to family members as gifts.

Copies of several checks purportedly drawn from the HW account dated between September 2015 and December 2015 reflect in the top left corner of the check "MARY A. OR RAY A. CLARK." The line immediately underneath states "LARRY D. CLARK", and a Lake Charles, Louisiana address appears on the next lines. The checks contain Ms. Clark's signature and were written to various members of the Rogers family, with notations that they were either gifts or for an education fund.

In his affidavit, Larry noted that a purported copy of a form HW deposit agreement dated May 25 2018, which was attached to the affidavit, stated as follows:

Your account is governed by the terms of this Agreement, the laws and regulations of the United States, and applicable state law. To the extent that state law applies, your account is governed by the laws of the state in which the branch office is located where you opened your account. If you did not open the account in person in a branch then to the extent that state law applies either (1) the law of the state in which you reside will apply, if you reside in a state in which we operate a branch or (2) if you do not reside in such a state, the law of the State of Mississippi will apply.

Larry then suggested in his affidavit that Mississippi law applied to the HW account because he "opened his part of the account through paperwork that was forwarded to Oklahoma." There is no such paperwork in the record. There are also no bank statements or any other documentation in the record pertaining to the HW account or otherwise identifying the nature or type of the account and/or the source of any funds that were put into the account.

When asked at the hearing about the source of the funds in the HW account, Larry testified, "I had funds that were in the accounts that eventually funneled into that account. So, in my opinion that was my funds that went into that account as well as Aunt Mary's." He further explained:

> This started in Kansas. The bank accounts started in Kansas where she was in Louisiana, where I was joint tenant with right of survivorship. So those funds in Kansas, under Kansas law, would be equally hers and mine.

> And then there were accounts as well that were outside of Louisiana where the money came in; so part of that money was mine that was deposited, and it's my feeling that it ended up in the Whitney account.

There are no documents pertaining to any Kansas bank accounts in the record.

Larry also testified at the hearing that he had produced some HW account statements to his counsel, Mr. Little, in the past, but that he did not recall when. He also said that he "produced the entire history within the last two or three weeks,

but . . . that account has not changed. It's been static since probably March of 2018." However, the only documents accepted into evidence pertaining to the HW account are the copies of checks dated in 2015 and the form "deposit agreement" from Hancock Whitney Bank.

When asked about his efforts to obtain documentation from when the HW account was originally opened, Larry testified that he went with counsel to a Hancock Whitney branch office in Lake Charles, they met with the President or an Executive Vice President and requested the information, and they were told "that that information was just simply not available."

Ultimately, the trial court concluded that the HW account was not part of the estate and denied the RST parties' motion to traverse the DDL. The trial court stated:

> I believe that the testimony was and the evidence was that the accounts, the funds arising out of the accounts were basically a continuum of transfers from one account to other account [sic]. All of those accounts were opened with joint tendency [sic] and with survivorship and that's going to be the basis under which the accounts were held and that's the basis under which Larry claims an interest in those accounts. And so I believe that Mississippi law for the bank in Mississippi as well the Minnesota law, both provided for joint tendency [sic].

"[I]t is well settled that a court of appeal may not set aside a trial court's . . . findings of fact in the absence of 'manifest error' or unless it is 'clearly wrong.'" *Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989). However, "[w]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence." *Ferrell v. Fireman's Fund Ins*. Co., 94-1252, p. 7 (La. 2/20/95), 650 So.2d 742, 747. "A legal error occurs when a trial court applies

11

incorrect principles of law and such errors are prejudicial" and thereby "materially affect the outcome and deprive a party of substantial rights." *Evans v. Lungrin*, 97-541, p. 7 (La. 2/6/98), 708 So.2d 731, 735 (citations omitted).

Louisiana law provides that a descriptive list of succession property "shall be accepted as prima facie proof of all matters shown therein, unless amended or traversed successfully." La.Code Civ.P. art. 3137. "Prima facie evidence is defined as evidence sufficient to establish a given fact and which, if not rebutted or contradicted, will remain sufficient." *Artificial Lift, Inc. v. Prod. Specialties, Inc.*, 626 So.2d 859, 862 (La.App. 3 Cir. 1993), *writ denied*, 634 So.2d 394 (La.1994). "The burden is on the party filing a motion to traverse to show that the descriptive list is error." *Succession of Lanier,* 17-540, p. 6 (La.App. 3 Cir. 5/30/18), 249 So.3d 1059, 1063, *writ denied*, 18-1091 (La. 10/15/18), 253 So.3d 1304, quoting *In re Succession of Feingerts*, 14-140, p. 9 (La.App. 4 Cir. 3/18/15), 162 So.3d 1215, 1221, *writ denied*, 15-0754 (La. 6/1/15), 171 So.3d 936.

The RST parties filed a motion to traverse Larry's May 7, 2020 DDL, arguing that Larry failed to establish any personal interest in the HW account and that the HW account should be included on the DDL as part of Ms. Clark's estate.

"Louisiana has a strong public policy interest in honoring a decedent's last will and testament[.]" *Succession of Angus*, 54,180, p. 15 (La.App. 2 Cir. 1/2/22), 333 So.3d 555, 563.

> Louisiana law has carved out only very limited specific exceptions to the general rule that property owned by a decedent at death will pass to her heirs via succession. Those exceptions are the nonprobate disposition of retirement accounts, life insurance, annuities, and deposit and savings accounts, credit union accounts, and savings and loan associations accounts. . . . In the absence of specific exclusion from Louisiana property and succession law, assets of a decedent remain subject to application of controlling Louisiana law.

*Id.* at 560 (footnotes omitted). These nonprobate transfers occur by contractual arrangements. "The party demanding performance of a contract has the burden of proving its existence." *La Bo J. P'ship. v. Louisiana Lottery Corp.,* 08-1279, p. 5 (La.App. 1 Cir. 1/30/09) 6 So.3d 191, 194, *writ denied*, 09-441 (La. 4/13/09), 5 So.3d 168.

Ms. Clark's Will bequeaths her property to the legatees named therein, including the RST parties, and the Will defines her property as "the property of which I [Ms. Clark] die possessed, of whatever nature or kind, wherever located and however acquired, incorporeal or corporeal, tangible or intangible, movable or immovable, separate or community, whether now owned by me or hereafter acquired."

It is undisputed that the HW account was property in Ms. Clark's possession on the date of her death. In addition, Larry's self-serving testimony in his affidavit and the attached copies of unauthenticated documents was insufficient to establish his personal ownership interest in the HW account. Therefore, by filing the motion to traverse, the RST parties sufficiently called into doubt the DDL's omission of the HW account from Ms. Clark's estate, and the burden therefore switched back to Larry to establish that the estate had no interest in the account. *See Artificial Lift, Inc.*, 626 So.2d 859.[2]

Larry, through counsel, has expressly admitted that the HW account was not established in conformity with the relevant provisions of La. R.S. 6:314, 6:315.1, 6:653.1 and/or 6:766.1, which, in certain situations, contemplate nonprobate

_____

[2] The trial court appears to have similarly concluded that the RST parties satisfied their initial burden in connection with their motion to traverse. In its reasons for ruling, it stated, "The motion to traverse Mr. Larry [Clark] clearly was granted because he was placed on the stand and he was questioned about his involvement as executor[,]" and "Yes, I believe that, that was a traversal the day we had the hearing. So to that extent, I granted it for that purpose. The traversal at the time that he was taken under cross examination."

dispositions of certain accounts such as payable on death accounts formed in accordance therewith. Rather, Larry argues that in accordance with the 2018 form "deposit agreement," Mississippi law applies when determining whether he became owner of the HW account upon Ms. Clark's death because he resided in Oklahoma when Ms. Clark opened the account, he signed the signature cards in Oklahoma, and there was no HW branch office in Oklahoma. The trial court agreed that Mississippi law and/or Minnesota law applied.

However, the undisputed evidence was that Ms. Clark opened the HW account at a branch office in Lake Charles, Louisiana, that she wrote a check to open the account, and that Larry was not present at the time. There are no signature cards pertaining to the HW account in evidence. Therefore, assuming its applicability, the May 2018 form "deposit agreement" clearly indicates that Louisiana law applies since Ms. Clark opened the account in Louisiana. The fact that Larry may have signed paperwork related to the account in Oklahoma does not mean the account was "opened" in Oklahoma.

In addition, while Minnesota law may have applied to the 1993 Calcasieu Marine Bank account, the Calcasieu Marine Bank account documents have no applicability to the HW account. According to Larry's testimony, Ms. Clark opened the HW account after Calcasieu Marine ultimately became Capital One. There is no basis in the record upon which to conclude that Hancock Whitney was a successor entity to either Calcasieu Marine Bank or Capital One, or that it was otherwise subject to any account agreements applicable to the Calcasieu Marine account.

Therefore, we find that the trial court committed legal error in applying Mississippi and/or Minnesota law to determine the ownership of the HW account.

14

In fact, there is no evidence in the record establishing that the 2018 "deposit agreement" was even applicable to the HW account at issue, much less any evidence showing when that account was opened.

Because the trial court committed legal error, we consider de novo whether Larry sufficiently established his personal interest in the HW account. However, given Larry's admission to both the trial court and to this court that the HW account was not formed in conformity with Louisiana law allowing a nonprobate disposition of certain payable on death accounts to a named beneficiary, we conclude that the account is not subject to nonprobate disposition under the narrow exceptions recognized by Louisiana law.

Larry also alternatively argues that Ms. Clark manually donated the HW account to him during her life.[3]

> "A donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another, called the donee, who accepts it." La.Civ.Code art. 1468. . . . "A donation inter vivos is without effect until it is accepted by the donee. The acceptance shall be made during the lifetime of the donor." La.Civ.Code art. 1544. "The acceptance of a donation may be made in the act of donation or subsequently in writing." *Id*. "When the donee is put into corporeal possession of a movable by the donor, possession by the donee also constitutes acceptance of the donation." *Id*. "A donation is effective upon acceptance. When the donation is effective, the ownership or other real right in the thing given is transferred to the donee." La.Civ.Code art. 1551.

> Generally, a donation inter vivos of a corporeal movable can be accomplished by manual delivery, pursuant to La.Civ.Code art. 1543, while the donation of an incorporeal movable requires an authentic act, unless the law provides otherwise, pursuant to La.Civ.Code art. 1541. It has long been held that "[a]n account on deposit is an incorporeal right." La.Civ.Code art. 473; *Broussard v. Broussard*, 340 So.2d 1309,

---

[3] While Mr. Clark made a similar argument to the trial court, the trial court did not appear to address it, given its conclusions that Mississippi and/or Minnesota law applied and the HW account was a "joint tenancy" account. We will therefore consider this argument in connection with our de novo review.

1313 (La.1976). However, there are *numerous exceptions* to the form requirement of Article 1541. La.Civ.Code art. 1541, Revision Comment (b), Revision Comments–2008. Additionally, the substantive requirements of divestment and donative intent must be fulfilled in order to effect a valid donation. *Rose v. Johnson*, [06-518 (La.App. 3 Cir. 9/27/06),] 940 So.2d 181[, *writ denied*, 06-2528 (La. 12/15/06), 944 So.2d 1273.]

*Succession of Love*, 16-245, pp. 5-6 (La.App. 3 Cir. 9/28/16), 201 So.3d 1027, 1030-31.

> The donee of a manual gift must show by **strong and convincing** proof that the donor had intent to irrevocably divest himself of a thing and that delivery was made; outward acts, together with any admissible evidence of the relationship of the parties, are important to prove a manual donation.

*Id*. at 1031-32 (emphasis added). Satisfying the strong and convincing burden of proof

> "[R]equires more than a 'preponderance of the evidence' but less than 'beyond a reasonable doubt.'" *Succession of Wiggins*, 08-63, p. 3 (La.App. 3 Cir. 6/4/08), 984 So.2d 948, 950, *writ denied*, 08–1355 (La. 9/26/08), 992 So.2d 989 (quoting *Succession of Lyons*, 452 So.2d 1161, 1165 (La.1984)). In other words, "[t]he existence of the disputed fact must be highly probable, that is, *much* more probable tha[n] i[t]s non-existence." *Id*. "This standard is usually employed 'where there is thought to be special danger of deception, or 'where the court considers that the particular type of claim should be disfavored on policy grounds.'" *Id.*

*Farrar v. Whaley*, 16-790, pp. 5-6 (La.App. 3 Cir. 2/1/17), 211 So.3d 449, 454, *writ denied*, 17-409 (La. 4/13/17), 218 So.3d 626.

Larry argues in his brief that the "history of the evolution of the HW[] account from the time it was created as a 'joint account with right of survivorship' in 1993 when funds were deposited in the Calcasieu Marine National Bank to its current status as an HW[] account," as well as the fact that Ms. Clark and Larry "signed the documentation which included a joint tenancy/survivorship provision that allowed either party the right to withdraw any or all funds at any time[,]"

16

support his argument that Ms. Clark donated the HW account to him during her life time.

We first note that there is no evidence in the record supporting any argument that the Calcasieu Marine account created in 1993 subsequently became the HW account or that Hancock Whitney was a successor entity to Calcasieu Marine. There is also no documentation showing that any funds in the Calcasieu Marine account were transferred to the HW account. Rather, the only testimony in the record concerning the source of any funds in the HW account is Larry's "feeling" that the funds from other accounts "ended up in the Whitney account," and there is no evidence indicating when the HW account was even opened. Further, there is no authentic act or any other document stating that Ms. Clark donated the HW account to Larry.

Nonetheless, Larry argues that this court's reasoning in *Succession of Love*, 201 So.3d 1027, supports a finding in the instant case that Ms. Clark donated the HW account to Larry. In *Love,* the court affirmed the trial court's determination that the decedent, James, had transferred two deposit accounts to his wife Rebecca via valid inter vivos donations prior to his death. James and Rebecca had resided together for several years, but they were not legally married until after James was diagnosed with terminal cancer. The court's decision in *Love* was based on a considerable amount of evidence beyond Rebecca's own testimony that established James's donative intent, including significant evidence of James's acts to divest himself of his possessions after his cancer diagnoses. This evidence included signature cards authorizing Rebecca's withdrawal of funds, an unlimited power of attorney that the court found authorized Rebecca to make inter vivos donations from the account to herself, and testimony by various witness concerning the close

17

relationship between James and Rebecca and James's intent to have Rebecca taken care of financially after his death without incurring the necessity of legal proceedings.

In the the instant case, however, there is no corroborating evidence establishing any donative intent on the part of Ms. Clark with respect to the HW account, and there is no indication that she was attempting to dispose of her property or accounts prior to her death. There are no signature cards or other documents in the record establishing what rights or interest Larry had with respect to the HW account, and there is no indication that any power of attorney Larry had with respect to Ms. Clark gave him the same unlimited power or control over the HW account as the power of attorney contract at issue in *Love*. Therefore, *Succession of Love* is distinguishable.

In addition, while the record contains three letters from Ms. Clark to Larry, none of them mention the HW account, or otherwise indicate Ms. Clark's intentions with respect thereto. A March 5, 1993 letter references the Calcasieu Marine Bank account and efforts to "get everything I have joint with you;" however, there is no indication that the HW account was in existence at the time of this letter, and a mere reference to creating joint accounts, does not establish donative intent by strong and convincing evidence. *See Butler v. Reddick*, 431 So.2d 396 (La.1983). Similarly, a July 9, 2000 letter discusses paperwork for a Sun America account. Finally, a May 1, 2002 letter references a conversation about Larry's role as administrator of Ms. Clark's estate, states that Ms. Clark understood what Larry told her about issuing himself a check, discusses potential administrator fees, and states that "we will have to handle yours as we go along." It also mentions prior "things" Ms. Clark had bought for Larry, but there is no

18

reference to the HW account or any indication that she intended to donate any accounts to him.

In *Butler*, 431 So.2d at 399, the court concluded that the mere fact that funds were placed into a joint account did not establish the decedent's donative intent, and it reversed the trial court's finding to the contrary in light of the "flimsy evidence presented." The court noted that "there [was] no corroboration of a donative intent, only the self-serving testimony of the donee that Johnson [the decedent] wanted her to have the money. '[T]estimony as to the oral declarations . . . of a dead man are of . . . little weight, . . .'" *Id.* (internal citations omitted).

Similarly, we conclude Larry failed to establish by strong and convincing evidence that Ms. Clark donated the HW account to Larry via a valid donation inter vivos.

Therefore, we reverse the trial court's June 29, 2021 judgment to the extent it denied the RST parties' motion to traverse the DDL with respect to the HW account. Judgment is rendered granting the motion to traverse and the detailed descriptive list is amended to reflect that the HW account is part of Ms. Clark's estate.

Similarly, the Final Judgment of Possession is partially vacated to the extent that it homologates the Amended Final Accounting and Tableau of Distribution submitted by Larry on August 12, 2012, and we remand these proceedings for the purpose of amending the Amended Final Accounting and Tableau of Distribution to adequately reflect the HW account at issue and its distribution to the legatees in accordance with Ms. Clark's Will.

**Representation by Mr. Little**

In their third assignment of error, the RST parties seek review of the trial court's June 29, 2021 judgment to the extent it denied their motion to disqualify Larry's counsel, Mr. Little. They argue that Mr. Little should have been disqualified for the same reasons that Larry should have been removed as independent administrator. However, because the trial court denied the RST parties' motion to disqualify Larry as independent administrator and that judgment is now final and not appealable as discussed above, we find no error in the trial court's denial of the RST parties' motion to disqualify Mr. Little. Further, "removing the . . . succession attorney . . . at this point in the proceedings would serve no useful purpose as this succession is in its final stages." *In re Succession of Brazan*, 07-566, p. 7 (La.App. 5. Cir. 12/27/07), 975 So.3d 53, 57.

**Attorney Fees**

While the RST parties' fourth and fifth assignments of error seek review of issues related to Mr. Little's attorney fees paid for by the succession, they have failed to brief or provide argument with respect to their fourth assignment of error. Therefore, in accordance with Uniform Rules—Louisiana Courts of Appeal, Rules 2-12.4(B)(4), the fourth assignment of error is deemed abandoned,[4] and we will consider only the fifth assignment of error. *See Longino v. City of Oakdale*, 21-296 (La.App. 3 Cir. 11/3/21), 332 So.3d 753.

In connection with their fifth assignment of error, the RST parties argue that the trial court erred in refusing to the compel Larry to produce documentation substantiating the attorney fees that the estate paid to Mr. Little as reflected in the

---

[4] The fourth assignment of error also seeks review of the executor's fee. However, this issue was also not briefed and therefore will not be considered on appeal.

Amended Accounting and Final Tableau of Distribution attached to Larry's August 12, 2021 petition. In connection with their objections to these documents, the RST parties asked the trial court to compel the production of these documents. Upon consent of the parties, however, this issue was submitted to the trial court without a contradictory hearing, and the trial court denied the RST parties' request noting that they had not served any formal discovery seeking the requested information. We find no error in the trial court's ruling to this extent.

**Penalties and Damages**

In connection with their final assignment of error, the RST parties argue that Larry should be assessed penalties and damages contemplated by La.Code Civ.P. art. 3222 because he failed to deposit the balance of the HW account into the Succession's account with Chase Bank.

Louisiana Code of Civil Procedure Article 3222 states:

> A succession representative shall deposit all moneys collected by him as soon as received, in a bank account in his official capacity, in a state or national bank in this state, and shall not withdraw the deposits or any part thereof, except in accordance with law.

> On failure to comply with the provisions of this article, the court may render a judgment against the succession representative and his surety in solido to the extent of twenty percent interest per annum on the amount not deposited or withdrawn without authority, such sum to be paid to the succession. He may also be adjudged liable for all special damage suffered, and may be dismissed from office.

We first note that the RST parties did not file a motion in the trial court that sought monetary damages under La.Code Civ.P. art. 3222 or otherwise. Rather, the only time the RST Parties argued their entitlement to damages and penalties under La.Code Civ.P. art. 3222 was in connection with their post-hearing memorandum filed after the April 21, 2021 hearing. The trial court did not

specifically rule on any such claim, and therefore, it is presumed that the relief requested was denied.

Because the RST parties' penalties and damages claim was not presented to the trial court in connection with a motion or other pleading, we find no abuse of discretion on the part of the trial court in not entertaining, and otherwise denying, the requested relief, and we will similarly not consider the RST parties' request for damages on appeal.

## DECREE

For the reasons set forth above, Larry Clark's motion to partially dismiss the appeal is hereby granted to the extent the appeal sought review of the trial court's June 29, 2021 judgment denying Laura Clark Rogers's, Lyn Clark-Shoemaker's, and Melissa Clarke Thorpe's motion to remove Larry Clark as the independent administrator.

In addition, the trial court's June 29, 2021 judgment denying Laura Clark Rogers's, Lyn Clark-Shoemaker's, and Melissa Clarke Thorpe's motion to traverse with respect to the Hancock Whitney account is hereby reversed. Judgment is rendered granting Laura Clark Rogers's, Lyn Clark-Shoemaker's, and Melissa Clarke Thorpe's motion to traverse to that extent, and the descriptive list is hereby amended to include the Hancock Whitney account as part of Mary Agnes Clark's estate and subject to disposition in accordance with her Will.

Further, the November 17, 2021 Final Judgment of Possession is partially vacated to the extent that it homologates the Amended Final Accounting and Tableau of Distribution submitted with Larry Clark's August 12, 2012 Petition, and we remand these proceedings for the purpose of amending the Amended Final Accounting and Tableau of Distribution to adequately include the Hancock

22

Whitney account at issue and its distribution to the legatees in accordance with Mary Agnes Clark's Will and in accordance with this ruling.

The June 29, 2021 judgment and November 17, 2021 judgment are otherwise affirmed.

Costs of this appeal are assessed to Larry Clark, in his capacity as independent administrator of Mary Agnes Clark's estate.

**MOTION FOR PARTIAL DISMISSAL GRANTED; REVERSED IN PART AND RENDERED; VACATED IN PART AND REMANDED WITH INSTRUCTIONS; AND AFFIRMED IN PART.**